# United States Court of Appeals
## For the First Circuit

No. 07-1588

ALEXANDRE ARONOV,

Plaintiff, Appellee,

v.

JANET NAPOLITANO,[*] ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Boudin, Lipez, and Howard, Circuit Judges.

Thomas H. Dupree, Jr., Principal Deputy Assistant Attorney General, Civil Division, with whom Gregory G. Katsas, Assistant Attorney General, Civil Division, and Donald E. Keener, Deputy Director, were on brief for appellants.
Gregory Romanovsky with whom Law Offices of Gregory Romanovsky was on brief for appellee.
Anthony Drago, Jr., Anthony Drago, Jr., P.C., Marisa A. DeFranco, Devine Millimet & Branch, Howard Silverman, Ross, Silverman & Levy LLP, Jeanette Kain, Ilana Etkin Greenstein, Harvey Kaplan, Kaplan, O'Sullivan & Friedman, Paul Glickman, Ellen Sullivan, Glickman Turley, LLP, Vard Johnson, William Graves, Kerry Doyle, and Graves & Doyle on brief for American Immigration Lawyers Association, amicus curiae.

[*]Pursuant to Fed. R. App. P. 43(c)(2), Janet Napolitano, Secretary of the U.S. Department of Homeland Security, has been substituted for former Secretary Michael Chertoff.

OPINION EN BANC

_____

April 13, 2009

_____

**LYNCH**, **Chief Judge**.  This case concerns the standards for an award of attorneys' fees against an agency of the United States under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A).  The Act requires such an award for a successful litigant who meets the particularized standards for being a "prevailing party," when the government's position, either before or after suit was filed, was not substantially justified, and provided that the award of fees would not otherwise be unjust. Id.; see also generally Smith v. Fitchburg Pub. Sch., 401 F.3d 16 (1st Cir. 2005).

Alexandre Aronov, an applicant for citizenship, sued the U.S. Citizenship and Immigration Service ("USCIS"), which immediately entered into a voluntary settlement and never filed a responsive pleading.  Instead the parties filed a joint motion to remand.  The district court issued a one-line order granting the joint motion to remand and terminating the case.  No hearing was ever held by the district court.  The order remanded to the USCIS, which swore in Aronov as a citizen on November 8, 2006, as it had represented in the joint motion that it would do.

Aronov, newly a citizen, then filed an application for fees and costs under the EAJA, which the district court granted in the sum of $4,270.94, over the opposition of the USCIS.  The USCIS appealed.  The award was originally upheld by a panel, over a dissent.

-3-

The USCIS sought en banc review, arguing that the panel decision, if left standing, would have dangerous systemic consequences far beyond this case. The precedent would "create[] an enormous incentive for individuals frustrated with delays in the naturalization process to file mandamus lawsuits in this Circuit; [and would] create[] an enormous disincentive for the agency to settle these cases by agreeing to grant naturalization." It argued the panel decision was contrary to law and "undermine[d] the uniform judgment of both Congress and the agency that background checks are critical to insuring public safety and national security." While the sum awarded in this case might be small, it said, the potential economic consequences were quite large. This court granted en banc review.[1]

We now reverse the award of fees and order dismissal of Aronov's EAJA application with prejudice on the two separate and independent grounds that he was not a prevailing party and that, whether or not he met the prevailing party requirement, USCIS's position in requiring an FBI name check was substantially justified. The key question is not whether a court ultimately agrees with the agency's reading of its legal obligations but whether the agency's position was substantially justified.

---

[1] We acknowledge with appreciation the assistance provided by the amicus American Immigration Lawyers Association.

I.

Aronov's suit, filed on August 28, 2006, was brought under 8 U.S.C. § 1447(b), which allows an applicant for citizenship to seek relief in federal district court if the USCIS does not act on the application within 120 days of his or her citizenship interview examination. Section 1447(b) provides in full:

> If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [USCIS] to determine the matter.

8 U.S.C. § 1447(b).

There are no disputed facts. Aronov, a native of Russia and permanent U.S. resident since 2001, submitted an application for citizenship to the USCIS on May 22, 2004. On February 14, 2005, a USCIS officer examined Aronov before the agency received a full FBI background check for him, contrary to USCIS regulations. The officer informed him that his application could not be approved until additional security checks were completed.

The USCIS erred by examining Aronov prematurely. By regulation, the agency may not schedule an interview, which starts the 120-day clock for filing suit under § 1447(b), until a full FBI background check for the applicant is complete. See 8 C.F.R.

-5-

§ 335.2(b) (the USCIS will schedule interviews "only after [it] has received a definitive response from the [FBI] that a full criminal background check of an applicant has been completed"). Mistakes happen. Nevertheless, the error was harmless[2] and accrued to Aronov's benefit. The early interview meant he was immediately eligible for citizenship upon successful completion of the FBI background check and, under the literal terms of § 1447(b), was able to bring suit if the agency did not act on his application within 120 days.

On March 23, 2006, the USCIS sent Aronov written notice that additional review of his case was necessary and asked Aronov to contact the agency if he did not receive a notice of action within six months.

Instead, Aronov sued. The USCIS did not file a responsive pleading. On October 6, 2006, Aronov and the government, having settled the case, filed a Joint Motion for Remand, stating that "USCIS ha[d] completed its review of plaintiff's application for naturalization and, if jurisdiction [were] returned to the agency, [USCIS] would grant the application and schedule plaintiff's oath ceremony for no later than November 8, 2006" and requesting that the court "remand the matter to USCIS

_____

[2] See generally Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 127 S. Ct. 2518, 2530 (2007) ("In administrative law . . . there is a harmless error rule." (quoting PDK Labs., Inc. v. U.S. Drug Enforcement Admin., 362 F.3d 786, 799 (D.C. Cir. 2004))).

so that it [could] grant plaintiff's application for naturalization, and schedule plaintiff's oath ceremony for no later than November 8, 2006." Except on paper, the parties did not even appear before the court, there were no hearings and no representations were made about the parties' negotiations or the history of the matter. On October 12, 2006, the court entered an electronic order,[3] which stated in full:

> Electronic ORDER granting [Docket Number] 3 Joint Motion to Remand to US Citizenship and Immigration Services.

That remand order forms the basis for the EAJA award at issue. By order dated January 30, 2007, the district court awarded fees on the basis that its order was a remand to the agency to do something and so met the judicial imprimatur requirement. The government, it found, unjustifiably delayed the petition, forced Aronov to file his action, and allowed for expedition only after mandamus was filed.

## II.

The EAJA provides in relevant part:

[A] court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against

---

[3] The parties agree the order was a final judgment; EAJA applications may not be filed until there is a final judgment. See 28 U.S.C. § 2412(d)(1)(B), (d)(1)(D)(2)(G); see also Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).

the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

The purpose of the Act is "to ensure that certain individuals . . . will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved." Scarborough v. Principi, 541 U.S. 401, 407 (2004) (quoting H.R. Rep. No. 99-120(I), at 4 (1985), reprinted in 1985 U.S.C.C.A.N. 132, 132-33). The EAJA "reduces the disparity in resources between individuals . . . and the federal government." H.R. Rep. No. 99-120(I), at 4.

Two issues are raised: (1) whether Aronov met the "judicial imprimatur" requirement of the "prevailing party" test; and (2) whether the USCIS has met its burden of showing that it did not act unreasonably.

We review a district court's determinations under the EAJA for abuse of discretion. Pierce v. Underwood, 487 U.S. 552, 558-59 (1988); Schock v. United States, 254 F.3d 1, 4 (1st Cir. 2001). An error of law is an abuse of discretion. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003); see also Atl. Fish Spotters Ass'n v. Daley, 205 F.3d 488, 491 n.2 (1st Cir. 2000). Whether a party is a prevailing party is itself a legal determination subject to de novo review. Rice Servs., Ltd. v.

-8-

<u>United States</u>, 405 F.3d 1017, 1021 (Fed. Cir. 2005); <u>Smyth ex rel.</u> <u>Smyth</u> v. <u>Rivero</u>, 282 F.3d 268, 274 (4th Cir. 2002). The district court's award rests on errors of law.

The EAJA is a departure from the traditional "American rule" that parties must ordinarily bear their own attorneys' fees. See <u>Alyeska Pipeline Serv. Co.</u> v. <u>Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975). Importantly, the EAJA is not simply a fee shifting statute. The EAJA is also a waiver by the government of its sovereign immunity and so must be construed strictly in favor of the government. <u>Ardestani</u> v. <u>INS</u>, 502 U.S. 129, 137 (1991). Whatever flexibility there may be in interpreting fee shifting statutes involving awards against parties other than the United States, such flexibility does not exist as to EAJA applications. See <u>Lehman</u> v. <u>Nakshian</u>, 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." (quoting <u>Soriano</u> v. <u>United States</u>, 352 U.S. 270, 276 (1957))).

A.      <u>The Judicial Imprimatur Standard Under the Prevailing</u>
        <u>Party Requirement of the EAJA</u>

We hold as a matter of law that Aronov is not a prevailing party under the order entered by the district court.

The Supreme Court set the general standards for defining the term "prevailing party" in federal attorneys' fees shifting statutes in <u>Buckhannon Board & Care Home, Inc.</u> v. <u>West Virginia</u> <u>Department of Health & Human Resources</u>, 532 U.S. 598 (2001), a case

concerned with fee statutes other than the EAJA.[4]  Buckhannon sets the minimum standards for prevailing party status under the EAJA. "[T]he Supreme Court's reasoning in 'Buckhannon is presumed to apply generally to all fee-shifting statutes that use the prevailing party terminology.'" Smith, 401 F.3d at 22 n.8 (quoting Doe v. Boston Pub. Sch., 358 F.3d 20, 25 (1st Cir. 2004)) (internal quotation marks omitted); accord Ma v. Chertoff, 547 F.3d 342, 344 (2d Cir. 2008) (per curiam) (collecting cases).

"[T]he term 'prevailing party' [is] a legal term of art." Buckhannon, 532 U.S. at 603.  To be a prevailing party, a party must show both a "material alteration of the legal relationship of the parties," id. at 604 (quoting Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792-93 (1989)), and a "judicial imprimatur on the change," id. at 605.

Both terms are illuminated by the potential meanings Buckhannon rejected: the Supreme Court held that mere success in accomplishing a party's objectives is insufficient to be a prevailing party for a fee award.  Buckhannon, 532 U.S. at 606. The Court rejected the "catalyst" theory which had been accepted by many circuits, including this one.[5]  The Court noted that use of

---

[4]   Buckhannon involved provisions of the Federal Housing Amendments Act of 1988, 42 U.S.C. § 3613(c)(2) and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12205.

[5]   Buckhannon thus overruled this circuit's prior acceptance of the catalyst theory in Guglietti v. Secretary of Health & Human Services, 900 F.2d 397 (1st Cir. 1990) (applying EAJA), followed in

-10-

the catalyst theory would have the adverse effect of discouraging the government from voluntarily settling cases (pre-suit or post-suit). See id. at 608 (noting the "disincentive that the 'catalyst theory' may have upon a defendant's decision to voluntarily change its conduct"). The Court stated that its plain language approach served the purpose of providing a clear formula allowing for ready administrability and avoiding the result of a second major litigation over attorneys' fees. See id. at 609-11.

Buckhannon explicitly identified two and only two situations which meet the judicial imprimatur requirement: where plaintiff has "received a judgment on the merits," which does not apply here, or "obtained a court-ordered consent decree." Id. at 605. The Court was clear that "settlement agreements enforced through a consent decree" may be the basis for fee awards and the resulting change in the legal relationship between the parties must be "court-ordered." Id. at 604 (emphasis added). The change in the legal relationship must be a "judicially sanctioned change." Id. at 605.[6] Notably, Buckhannon, which affirmed the judgment of the Fourth Circuit in denying fees, did not adopt that portion of

---

Paris v. United States Department of Housing & Urban Development, 988 F.2d 236 (1st Cir. 1993) (same).

[6] The Court said these requirements were imposed by the plain language of the statute and while there was no need to resort to legislative history, that history was consistent with these requirements. Buckhannon, 532 U.S. at 607-08. We reject Aronov's arguments that the legislative history supports a broader approach.

-11-

the Fourth Circuit rule which permitted an award of fees for a "settlement giving some of the legal relief sought" in addition to fees for an "enforceable judgment [or] consent decree." Id. at 602.

The order here was plainly not a judgment on the merits, nor was it labeled a "court-ordered consent decree." That, however, does not end the matter. We agree with other circuits that the formal label of "consent decree" need not be attached;[7] it is the reality, not the nomenclature which is at issue. Sometimes the question has been phrased in terms of whether a given court order is the "functional equivalent of a consent decree"; the better articulation may be to ask whether the order contains the sort of judicial involvement and actions inherent in a "court-ordered consent decree." The district court did not allow EAJA fees on the basis that the order it entered was the equivalent of a consent decree. Rather, it said in its award order that it entered the award on the ground that it had entered an order compelling the agency to take action, which it thought was

---

[7]    See, e.g., Davy v. CIA, 456 F.3d 162, 166 (D.C. Cir. 2006) (holding, under the attorneys' fee provision of the Freedom of Information Act, that an award was appropriate even though the court's order was "styled 'order' as opposed to 'consent decree'"); see also Rice Servs., 405 F.3d at 1026-27 (EAJA); T.D. v. LaGrange Sch. Dist. No. 102, 349 F.3d 469, 478 (7th Cir. 2003) (Individuals with Disabilities Education Act); Roberson v. Giuliani, 346 F.3d 75, 81 (2d Cir. 2003) (42 U.S.C. § 1988); Truesdell v. Phila. Hous. Auth., 290 F.3d 159, 165 (3d Cir. 2002) (same); Am. Disability Ass'n, Inc. v. Chmielarz, 289 F.3d 1315, 1320 (11th Cir. 2002) (ADA); Smyth, 282 F.3d at 276 (§ 1988).

sufficient to support an award.  Indeed, Aronov never argued to the district court that this situation was so like a consent decree as to constitute the requisite judicial imprimatur.  Nonetheless, the consent decree theory is the primary grounds now asserted, and the parties have addressed the issue to the en banc court.  We bypass his waiver and address the argument.[8]

The Supreme Court has described what it meant by a "court-ordered consent decree."  It distinguished such consent decrees from "private settlements" (as to which fees may not be awarded), saying "[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees."  Id. at 604 n.7.  Buckhannon contrasted final judgments on the merits and court-ordered consent decrees with situations which failed to meet the judicial imprimatur test: for example, securing the reversal of a directed verdict, acquiring a judicial pronouncement that a defendant has violated the Constitution unaccompanied by "judicial relief," or obtaining a non-judicial "alteration of actual circumstances."  Id. at 605-06.

The Court emphasized three related factors.  The first was that the change in legal relationship must be "court-ordered."  See id. at 604.  Second, there must be judicial approval of the relief vis-à-vis the merits of the case.  Buckhannon cited Kokkonen

---

[8]   There is no basis, as a result, to consider deference to non-existing "findings" of the district court, as to whether this was the equivalent of a consent decree.

-13-

v. Guardian Life Insurance Co. of America, 511 U.S. 375, 381 (1994), which held a "judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order." Third, there must be judicial oversight and ability to enforce the obligations imposed on the parties. See Buckhannon, 532 U.S. at 604 n.7 (noting that judicial oversight is inherent in consent decrees but not in private settlements).

These factors from Buckhannon are themselves, not surprisingly, contained in the law of consent decrees. A consent decree "embodies an agreement of the parties," that they "desire and expect will be reflected in, and be enforceable as, a judicial decree." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992)); see also Ricci v. Patrick, 544 F.3d 8, 17 (1st Cir. 2008), cert. denied, ___ S.Ct. ___, 2009 WL 229763 (Apr. 6, 2009). As the Fourth Circuit noted in Smyth:

> A consent decree, because it is entered as an order of the court, receives court approval and is subject to the oversight attendant to the court's authority to enforce its orders, characteristics not typical of settlement agreements. [Buckhannon]'s admonition that consent decrees may satisfy the prevailing party standard while private settlements ought not be so construed is thus consistent with the general purposes and effects of the two forms of resolution of disputes.

Smyth, 282 F.3d at 281. Court approval of a consent decree must involve some appraisal of the merits. See id. at 279. By

contrast, a private settlement does not, ordinarily, receive court approval.  Id. at 280.  A court entering a consent decree must examine its terms to be sure they are fair and not unlawful.  See id.; see also T.D., 349 F.3d at 479 ("Mere involvement [by the court] in a settlement . . . is not enough.  There must be some official judicial approval of the settlement.").  As an example, the Third Circuit held in John T. ex rel. Paul T. v. Delaware County Intermediate Unit, 318 F.3d 545, 558-60 (3d Cir. 2003), that neither a preliminary injunction nor a contempt order based on that injunction contained the necessary judicial imprimatur because neither had required the court to weigh the merits of the underlying dispute.[9]

Further, an obligation to comply and the provision of judicial oversight to enforce that obligation are the sine qua non for a consent decree.  See Smyth, 282 F.3d at 279-81; see also Roberson, 346 F.3d at 82-83; Am. Disability Ass'n, 289 F.3d at 1320.  While a consent decree begins as a settlement, it is one that "includes an injunction, or some other form of specific relief," which may ultimately be enforceable by contempt.  C.A. Wright & M.K. Kane, Law of Federal Courts § 98, at 702 n.2 (6th ed. 2002).  This means enforcement through an action for breach of

---

[9]    A consent decree, which has attributes both of contracts and of judicial decrees, Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 519 (1986), must, therefore, go beyond contractual obligations.

-15-

contract, which may be available in a private settlement, is insufficient to meet the standards for a consent decree. See Christina A. ex rel. Jennifer A. v. Bloomberg, 315 F.3d 990, 993 (8th Cir. 2003).

"The parties to a consent decree expect and achieve a continuing basis of jurisdiction to enforce the terms of the resolution of their case in the court entering the order." Smyth, 282 F.3d at 280. A private settlement agreement, by contrast, does not require the same level of judicial oversight.

Another characteristic of the judicially approved obligations in a consent decree is that a party seeking to modify a consent decree must meet a significant burden to demonstrate that circumstances have changed to a degree that justifies a modification. See generally Rufo, 502 U.S. at 378-83; see also Fed. R. Civ. P. 60(b). This is so because, by its nature, a consent decree contemplates a court's continuing involvement in a matter.[10]

Application of these principles necessarily results in the conclusion the order entered here did not meet the judicial imprimatur standards for a prevailing party. Whether an order

---

[10]  In Pierce, a pre-Buckhannon case where the Supreme Court affirmed an award of EAJA fees, the district court administered and enforced the settlement agreement reached. See Pierce, 487 U.S. at 556 (noting that the government had created a $60 million settlement fund and that a California federal court had taken responsibility for administering the settlement).

-16-

contains a sufficient judicial imprimatur can only be determined by determining the content of the order against the entire context before the court. The order here lacked all of the core indicia of a consent decree. The court did not order USCIS to do anything.[11] The court made no evaluation at all of the merits of the controversy -- indeed the court was never asked to do so; it was only asked to dismiss the case. There was no basis on which the court could evaluate the merits because the USCIS never filed an answer, never raised the potential defenses it had, and there never was an engagement of any sort on the merits for the district court to consider.[12] Further, the order itself did not contain provisions

_____

[11] We need not address what the proper vehicle would have been had the USCIS failed to carry through with its representation that it would grant citizenship. But it is clear that the district court erred in concluding it could directly hold the USCIS in contempt in such circumstances because the order did not issue a mandate to the USCIS. Before a court can find a party in contempt for violating an order, it must conclude that "the words of the court's order have clearly and unambiguously forbidden the precise conduct on which the contempt allegation is based." United States v. Saccoccia, 433 F.3d 19, 28 (1st Cir. 2005) (emphasis in original); see also id. ("[T]he test is whether the putative contemnor is 'able to ascertain from the four corners of the order precisely what acts are forbidden.'" (emphasis added) (quoting Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 76 (1st Cir. 2002))). A consent decree may itself contain mandatory language that is directly enforceable by a contempt action.

[12] This case is factually distinguishable from the Tenth Circuit's recent decision in Al-Maleki v. Holder, No. 07-4260, 2009 WL 692612 (10th Cir. Mar. 18, 2009). There, the court upheld an award of fees under the EAJA where the district court, after the case was filed, denied the government's initial motion for an unrestricted remand after a hearing, ordered the government to file an answer, accepted the representations in the answer, then granted a joint motion to remand, and entered an order expressly directing

-17-

for future enforcement typical of consent decrees.  See Kokkonen,
511 U.S. at 381; Saccoccia, 433 F.3d at 28.  The order also did not
resolve a dispute between the parties, it merely returned
jurisdiction to the agency to allow the parties to carry out their
agreement.[13]  Indeed, the order would not create prevailing party

the USCIS to administer the oath of citizenship to the applicant,
Abbas Al-Maleki.  The court found an order directing the agency to
act was required because, as the court noted, "at the time the
district court's order was entered, USCIS had not yet naturalized
Al-Maleki or made a binding commitment to do so."  Id. at *3.
Here, there were no such proceedings.  No such order was entered;
the court only remanded to the agency for it to act on its promise
to grant citizenship.  Our pointing out these factual distinctions
should not be taken as agreement with the panel decision of the
Tenth Circuit on this or any other point.

[13]    The dissenters appear to characterize the district court
as either having essentially issued an injunction requiring the
agency to perform certain actions or as somehow having turned the
remand into a consent decree.  The dissenters' reading is not based
on the actual October 12, 2006 remand order, but on the district
court's later characterization of the order.  The argument is
flawed for a number of reasons.  First, the district court itself
did not at any time characterize itself as having issued an
injunction or as having approved a consent decree which
incorporated other terms into its order, and properly so.  The
requirements of Rule 65 were never met nor sought to be met nor was
this presented as a consent decree.
    Second, the October 12, 2006 order on its face is merely
an allowance of a motion to remand, it was not an injunction nor
did it incorporate anything else.  On its face, the order was
unambiguous and lacked any provision mandating the USCIS to act or
expressly retaining jurisdiction to force the government to act.
While the allowance of motions for remand after litigation may meet
the EAJA criteria for judicial imprimatur, this did not.
    Third, while a district court's later characterization of
what it had intended in an earlier order may at times be helpful,
this situation does not fall into any of the usual patterns.  For
example, the district court was not involved in settlement
negotiations which enabled it to shed light on the nature of the
settlement.  See F.A.C., Inc. v. Cooperativa de Seguros de Vida de
P.R., 449 F.3d 185, 192 (1st Cir. 2006).  Nor was this an issue of

-18-

status under the tests adopted by any of the circuits.  See, e.g.,

Davy, 456 F.3d at 165-66; Rice Servs., 405 F.3d at 1027; T.D., 349

F.3d at 478; Roberson, 346 F.3d at 81; Truesdell, 290 F.3d at 165;

Am. Disability Ass'n, 289 F.3d at 1320-21; Smyth, 282 F.3d at 276.

Aronov's argument is also inconsistent with Smith, which

held that the fact that the defendant has voluntarily agreed to

change its behavior does not lead to prevailing party status for

the plaintiff.  A plaintiff does not become a prevailing party if

the court merely recognizes what the government has voluntarily

---

whether statements from the bench were meant to be a judicial
order.  See New Eng. Reg'l Council of Carpenters v. Kinton, 284
F.3d 9, 30 (1st Cir. 2002).  Nor was there any ambiguity in its
October 12 order.  See Harvey v. Johanns, 494 F.3d 237, 242 (1st
Cir. 2007).
        Fourth, it is also firmly the law that there must be a
clear basis within the order (of October 12) for both the court's
continuing jurisdiction and its power to enforce an agreement
between the parties.  Kokkonen, 511 U.S. at 381; Saccoccia, 433
F.3d at 28.  In F.A.C., we held that a court's order must expressly
retain jurisdiction or expressly incorporate the terms of a
settlement agreement to satisfy Kokkonen.  A "bare reference to 'a
settlement agreement' does not satisfy Kokkonen."  F.A.C., 449 F.3d
at 190.  That was not done here.  See also Smith,  401 F.3d at 24
("For an order to be considered the functional equivalent of a
consent decree, . . . '[t]he obligation to comply with a
settlement's terms must be expressly made part of a court's order
for jurisdiction to enforce the settlement after dismissal of the
action to exist.'" (quoting Smyth, 282 F.3d at 283 (emphasis
added))); Hospitality House, Inc. v. Gilbert, 298 F.3d 424, 431-32
(5th Cir. 2002) (holding a district court order that included a
settlement order attached as an exhibit did not satisfy Kokkonen
because "to make a settlement agreement part of a dismissal order
by incorporation, Kokkonen requires a district court to clearly
indicate its intention within the dismissal order itself by
expressly incorporating the agreement's terms" and noting that "a
number of our sister circuits have similarly interpreted
Kokkonen").

-19-

agreed to and only "requir[es] [the government] to follow through with what [it] had already voluntarily promised to do." Smith, 401 F.3d at 27.

Aronov makes a separate argument that a remand to the agency was necessary so that citizenship could be granted, and that this suffices to make him a prevailing party. We need not resolve the question of whether the agency could have acted without the remand,[14] as it does not matter to our resolution of the judicial imprimatur issue. The order remanding to the agency is alone not enough to establish the needed imprimatur. See, e.g., Rice Servs., 405 F.3d at 1025 (under the EAJA, securing a remand order alone is insufficient; the claimant must secure relief on the merits); see also Envtl. Def. Fund, Inc. v. Reilly, 1 F.3d 1254, 1257-58 (D.C. Cir. 1993) (same, applying Resource Conservation and Recovery Act). Aronov's argument is simply an effort to revive the "catalyst theory," which the Supreme Court has rejected.

B.        Substantial Justification

Even if the court order in this case had the attributes of a consent decree, the remaining condition for an EAJA award has not been met. We also hold as a matter of law that the government

---

[14]     Compare Etape v. Chertoff, 497 F.3d 379, 383-87 (4th Cir. 2007) (holding that a district court has exclusive jurisdiction once a § 1447(b) suit is filed), and United States v. Hovsepian, 359 F.3d 1144, 1159 (9th Cir. 2004) (en banc) (same), with Xie v. Mukasey, 575 F. Supp. 2d 963, 964-65 (E.D. Wis. 2008) (holding that the court and USCIS have concurrent jurisdiction), and Bustamante v. Chertoff, 533 F. Supp. 2d 373, 376 (S.D.N.Y. 2008) (same).

has met its burden to show its pre-litigation actions or inactions[15] which led to this suit were substantially justified.

An action is "substantially justified" if "it has a reasonable basis in law and fact." Pierce, 487 U.S. at 566 n.2. The government's conduct must be "justified to a degree that could satisfy a reasonable person." Id. at 565; see also Schock, 254 F.3d at 5. The government need only have "a reasonable basis both in law and in fact for its position." De Allende v. Baker, 891 F.2d 7, 12 (1st Cir. 1989); see also United States v. Yoffe, 775 F.2d 447, 449 (1st Cir. 1985).

Importantly, for EAJA purposes, the position of a government agency can be substantially justified even if a court ultimately determines the agency's reading of the law was not correct. Pierce, 487 U.S. at 566 n.2 ("[A] position can be justified even though it is not correct, and we believe it can be substantially . . . justified if a reasonable person could think it correct."). The government's position as to what the law requires may be substantially justified even if its interpretation of its legal obligations is not ultimately affirmed by a court. Schock, 254 F.3d at 5. In De Allende, we held that the district court abused its discretion in awarding attorneys' fees under the EAJA when the government was "at least reasonable" in denying a visa,

---

[15]    The parties agree that the government's post-litigation conduct was substantially justified.

even though the applicant's interpretation of the underlying law ultimately prevailed. De Allende, 891 F.2d at 12, 13; see also Li v. Keisler, 505 F.3d 913, 920 (9th Cir. 2007) (holding, under the EAJA, that "[i]n the absence of guidance from this court, the government's position was substantially justified"); Trahan v. Brady, 907 F.2d 1215, 1219-20 (D.C. Cir. 1990) (finding substantial justification where government acted in response to what it reasonably, though incorrectly, believed was its statutory obligation).

And of course, if the agency reasonably believes the action or inaction is required by law, then, by definition it cannot be the basis for an award of EAJA fees. See Dantran, Inc. v. U.S. Dep't of Labor, 246 F.3d 36, 41 (1st Cir. 2001) (the government's pre-litigation conduct of initiating a debarment procedure was substantially justified because it was required to do so by statute).

Aronov's argument rests on a fundamental misapprehension of what substantially justified means. His argument is addressed to why he thinks the agency is not legally "right" in its position and not to whether the USCIS position was substantially justified, a different question. The test is whether a reasonable person could think the agency position is correct. Pierce, 487 U.S. at 566 n.2. While we think the agency was "right" in how it handled the matter, the substantial justification analysis does not hinge

on whether the agency was right or wrong but on whether its actions were reasonable.

Aronov concedes no case flatly held the law required the agency to adopt his position. Nonetheless, he argues the position was unreasonable because no statute mandates USCIS to use the backlogged FBI name check,[16] and that § 1447(b) establishes a "statutory deadline" of 120 days after the interview to grant or deny citizenship, and so violation of the deadline means the government's position was not substantially justified.

The decision by the agency not to grant Aronov citizenship until his background check was completed, even if that exceeded 120 days, stemmed from two statutory mandates under which the agency must operate. First, 8 U.S.C. § 1446(a) provides that "[b]efore a person may be naturalized, an employee of [the USCIS] . . . shall conduct a personal investigation of the person applying

---

[16]    In May 2008, USCIS had approximately 270,000 name check cases pending for all categories of applicants, and over 80% of the cases had been pending for more than 90 days. In April 2008, USCIS and the FBI announced a joint plan to eliminate the backlog in name check searches by refining the search process and increasing the amount of staff dedicated to conducting searches. See Citizenship and Immigration Services Ombudsman, Annual Report 2008, at 6-7, available at http://www.dhs.gov/xlibrary/assets/CISOMB_Annual_Report_2008.pdf.  The number of pending name checks dropped to approximately 95,000 by August 2008. See Press Release, Update on Pending FBI Name Checks and Projected Naturalization Processing Times, http://www.dhs.gov/xnews/releases/pr_1220993097713.shtm. An amicus brief filed by the American Immigration Lawyers Association reported a study of cases filed in district courts in the First Circuit.  It concluded that plaintiffs had filed 137 cases involving naturalization delay litigation in 2007.

for naturalization." Second, in a budgetary statute that has continuing effect, Congress provided that "none of the funds appropriated or otherwise made available to the [USCIS] shall be used to complete adjudication of an application for naturalization unless the [USCIS] has received confirmation from the [FBI] that a full criminal background check has been completed." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 105-119, 111 Stat. 2440, 2448-49 (1997) [hereinafter 1997 Appropriations Act]. These are statutory commands the agency could not ignore.

Aronov's argument is that the phrase "confirmation from the [FBI] that a full criminal background check has been completed" did not require the USCIS or the FBI to include an FBI name check in that process. While it might have been reasonable, he argues, to require the FBI name check if it could have been completed within 120 days, it was not reasonable to do so if that name check requirement virtually guaranteed that the application process would take longer than 120 days to complete.

It is true that Congress did not define for the agency what a full criminal background check was. Congress chose to let the USCIS, with its particular expertise, decide the content of that "confirmation from the [FBI] [of] a full criminal background check." 1997 Appropriations Act, 111 Stat. at 2448-49. That delegation to USCIS is entirely sensible for a number of reasons,

-24-

including the sometimes rapidly evolving law enforcement technologies. The USCIS decided in 2002 that the inclusion of FBI name checks provided better full criminal background investigations. It reached this conclusion after the terrorist attacks of September 11, 2001 and after it discovered that deficiencies in its previous screening process had resulted in the grant of naturalization to a man suspected of ties to the terrorist group Hezbollah. See S.S. Hsu & N.C. Aizenman, FBI Name Check Cited in Naturalization Delays, Wash. Post, June 17, 2007, at A1. Also, Congress used the word "full" criminal background check, which supports the choice of the commonly used FBI name checks.[17]

Further, Congress has since essentially endorsed the USCIS's choice to use FBI name checks as part of the required criminal background check when, in 2007 (after the delay in this case), it addressed the delays by appropriating $20 million to USCIS to "address backlogs of security checks associated with pending applications and petitions" provided that the agency submitted a plan to eliminate the backlogs and ensure that the

---

[17] The FBI provides name check information to dozens of federal, state, and foreign agencies "seeking background information from FBI files on individuals before bestowing a privilege -- [w]hether that privilege is government employment or an appointment; a security clearance; attendance at a White House function; a Green card or naturalization; admission to the bar; or a visa for the privilege of visiting our homeland." Foreign Travel to the United States: Testimony Before the H. Comm. on Gov't Reform (July 10, 2003) (statement of Robert J. Garrity, Jr., Assistant Dir. (Acting), Records Mgmt. Div., FBI), available at 2003 WL 21608243.

agency "has the information it needs to carry out its mission."[18] Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, div. E, tit. IV, 121 Stat. 1844, 2067 (Dec. 26, 2007).

Congress chose not to prohibit the use of the FBI name check, but rather provided funding to expedite the process USCIS had chosen. The agency's, and the FBI's, choices to use name checks were clearly within their legal authority and were reasonable. Principles of administrative law require that courts defer to reasonable interpretations by an agency on matters committed to the agency's expertise by Congress. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984); Global NAPs, Inc. v. Verizon New Eng., Inc., 505 F.3d 43, 47 (1st Cir. 2007). Agencies are also entitled to deference with respect to policy determinations. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled on other

---

[18]  Congress's appropriation also addresses amicus's policy argument that the fact that cases brought under § 1447(b), like Aronov's, have spurred the agency to speed up the name check process should lead us to award fees. While § 1447(b) claimants and their counsel may play a commendable role in bringing attention to the backlog problem, amicus's argument is relevant only to the catalyst theory. Further, the government had been aware of the backlog in security checks before the peak in litigation that amicus cites, see, e.g., Citizenship and Immigration Services Ombudsman, Annual Report 2004, at 4-5, available at http://www.dhs.gov/xlibrary/assets/CISReport_to_Congress.pdf, and it responded by securing additional resources to address the problem, see, e.g., Oversight of the Federal Bureau of Investigation: Hearing before the S. Judiciary Comm. (Sept. 17, 2008) (statement of Robert S. Mueller, III, Dir., FBI) ("[W]hen we had the backlog, [and] recognized it, we sought the funding, [and] received the funding to address the backlog.").

grounds by <u>Califano</u> v. <u>Sanders</u>, 430 U.S. 99 (1977); <u>Global NAPs</u>, 505 F.3d at 47; <u>Associated Fisheries of Me., Inc.</u> v. <u>Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997). Once the USCIS made that choice, it acted under the requirements of law -- its own regulations -- in awaiting the full background check. Aronov argues the agency was not permitted to make that choice because it was mandated by statute, § 1447(b), to complete all checks within 120 days.

In its briefing to this court, USCIS has taken the position that the statute does not impose a flat 120-day deadline to grant citizenship. The agency argues that the plain text of the statute says only that if the agency fails to make a determination of citizenship within the 120-day period after the interview, "the applicant may apply to the United States district court" for it to "determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter." 8 U.S.C. § 1447(b). The agency also supports its reading with a reference to the Congressional history. <u>See</u> 135 Cong. Rec. H4539, H4542-43, 1989 WL 182156 (daily ed. July 31, 1989) (legislative history of § 1447(b)'s 120-day provision) (discussing the importance of addressing delays but making no mention of a deadline on the agency).

If the statute is read literally, as the USCIS argues, the agency could reasonably believe it does not violate the statute by not acting within 120 days on the grounds that the statute does

not command it to act within the deadline. <u>Cf.</u> <u>United States</u> v. <u>James Daniel Good Real Prop.</u>, 510 U.S. 43, 63 (1993) (holding that dismissal of government's forfeiture action for failure to follow statutory timing guidelines was unwarranted because "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction").

Aronov replies that even if the statute does not set a deadline of 120 days, the agency by regulation has. <u>See</u> 8 C.F.R. § 335.3(a) ("A decision to grant or deny the application shall be made at the time of the initial examination or within 120 days after the date of the initial examination of the applicant . . . ."). That regulation should, of course, be read in the context of the regulations defining when an initial determination may take place. Aronov was mistakenly given a premature initial examination. <u>See</u> <u>id.</u> § 335.2(b).

Even were the agency's views wrong as to the requirement for FBI name checks and as to whether the statute and/or regulation imposed a flat 120-day deadline, its views were still substantially justified. Neither the Supreme Court nor this court has ever held that FBI name checks are not required as part of full FBI background checks or that § 1447 imposes an absolute time limit for granting citizenship regardless of whether the name check is completed. At most, then, this is a situation in which an agency

-28-

has imposed regulatory requirements on itself that are in tension, and the solution it chose, to bend the 120-day rule because the background check was not completed, is entirely reasonable.

Independently, the choice by USCIS to favor national security in requiring a full check of the background of a citizenship applicant over a self-imposed 120-day deadline, regardless of whether the interview was prematurely granted here, cannot be unreasonable. As the USCIS has stated:

> Although [FBI name checks] may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means. This is particularly true given that in[] a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. . . . USCIS is committed to effective background checks, and thus is committed to the FBI name check.

USCIS, Response to the Citizenship and Immigration Services Ombudsman's 2006 Report, at 10, available at http://www.dhs.gov/ xlibrary/assets/USCIS-Response-Ombudsman-06-Report-May-2007.pdf. It is not unreasonable for the agency to require greater certainty when deciding whether to grant citizenship. See Alexander v. INS, 74 F.3d 367, 370 (1st Cir. 1996) ("[T]he right in question -- American citizenship -- is one of the most precious imaginable.").

Indeed, the importance of the greater certainty that the name check provides is highlighted by the agency's choice in 2007

-29-

to address the backlog problem by distinguishing between applicants for residency and applicants for citizenship -- USCIS grants residency to applicants if their cases were otherwise complete but their name checks remained pending over 180 days from the date of the initial request.  See USCIS Interoffice Memorandum, Revised National Security Adjudication and Reporting Requirements (Feb. 4, 2008), available at http://www.uscis.gov/files/pressrelease/DOC017. PDF.  The agency reasonably concluded that, if the name checks turned up negative information about applicants, it could initiate removal proceedings against those granted residency while it would have much more difficulty proceeding against those granted citizenship.  See S.S. Hsu, U.S. to Skirt Green-Card Check, Wash. Post, Feb. 12, 2008, at A3 (citing statement by USCIS spokesperson Christopher S. Bentley).

Aronov advances one more reason why, in his view, the agency had been unreasonable.  He argues that the USCIS had created a system for giving priority to certain applicants, under which the agency would request the application be expedited if, for example, the applicant were facing military deployment.  One of the official factors is whether the applicant has filed an action for mandamus.[19]  Aronov says that this has created an incentive system which

_____

[19]    The criteria for expediting are: "Military deployment must be imminent," "Age-out benefits," "Writ of Mandamus," "Immigration Judge cases -- grant of lawful permanent residence," and "Compelling reasons as provided by the requesting office (i.e., critical medical condition) assessed on a case by case basis."

-30-

requires candidates to sue to get priority in having FBI name checks done, which unreasonably forces applicants to sue. As the USCIS points out, the logic of this argument is to impose EAJA fees on it in the numerous instances it has benefitted an applicant by giving priority to the applicant's name check.

The reasoning assumes there is some right in the applicant to priority, but there is no statutory right, given to Aronov or anyone else, to jump the queue. And the agency's choice to give priorities to the categories it selected was a rational allocation of resources,[20] which must be spent on litigation if the agency does not work out a voluntary solution.[21] For the same

---

[20] Aronov and amicus argue that in an EAJA action, a court can never consider the resources of the agency on the question of whether the agency's actions were substantially justified. That is not so. Aronov and amicus wrongly rely on the Court's statement in Commissioner, INS v. Jean, 496 U.S. 154 (1990), that under the EAJA, "[t]he Government's general interest in protecting the federal fisc is subordinate to the specific statutory goals of encouraging private parties to vindicate their rights." Id. at 164-65 (footnote omitted). This statement addresses only the argument, which the government does not make here, that the agency's need for resources should outweigh a successful applicant's right to an award. It is simply irrelevant to the separate issue of whether the government's prelitigation position was substantially justified. A court can, and should, take into account the resources that an agency has to meet its statutory commands and to proceed in fairness to all applicants in light of the constraints under which it operates. The EAJA was meant to allow plaintiffs to challenge "unjustified governmental action"; the state of an agency's resources is material to whether its choice was or was not justified. Here, the agency was justified in acting as it did in light of its resources.

[21] In Al-Maleki, the Tenth Circuit found the government's prelitigation conduct not substantially justified. There, the issue was defined as whether the USCIS had unreasonably rejected

-31-

reasons, Aronov's argument that he should be given fees against the FBI if not the USCIS fails.

III.

The order awarding attorneys' fees is <u>reversed</u> and the application for fees is ordered dismissed with prejudice.

**-Dissenting Opinions Follow-**

---

petitioner's informal efforts to resolve the matter and failed, after the 120-day period, to request an expedited FBI name check. The only justification presented by the government, unlike this case, was that it was unable, at that point, to request expedition. The circuit court found this was factually untrue. It also held "[b]ecause USCIS ha[d] not offered any other justification for its prelitigation actions," <u>Al-Maleki</u>, 2009 WL 692612, at *7, there was no abuse of discretion. Thus, that court was not faced with the justifications offered to us.

**TORRUELLA**, **Circuit Judge** **(Dissenting).** This appeal presents a recurring example of what appears to be this Court's varying standards when judging governmental power as compared to those that apply to citizen challenges to government authority.

I join Judge Lipez's dissent, which carefully explains how the government failed to comply with its own regulations and deadlines, thereby unreasonably forcing Aronov to sue to obtain relief. I write separately only to lament the double standard we apply. It is with monotonous regularity that we dispatch claims of immigration petitioners who have failed to meet one filing deadline or another.[1] That outcome is sometimes dictated by law. Yet, when a successful plaintiff attempts to get relief provided by the law by seeking $4,270.94 in attorney's fees incurred while forcing the government to adjudicate his much-delayed application, this Court uses exceptional en banc procedures to reverse the award.[2] Even established rules do not seem to influence this Court when it seeks

---

[1] See, e.g., Chedad v. Gonzales, 497 F.3d 57, 66 (1st Cir. 2007) (rejecting an immigrant's claim to adjustment of status by refusing to toll the time period for voluntary departure while a motion to reopen was pending), overruled by Dada v. Mukasey, 128 S. Ct. 2307 (2008); Sharari v. Gonzales, 407 F.3d 467, 473 (1st Cir. 2005) (explaining limitation on judicial review of BIA determinations regarding timeliness of asylum applications); Zhang v. INS, 348 F.3d 289, 292 (1st Cir. 2003) (explaining the strict jurisdictional timing requirements on appeals of asylum applications and limitation on tolling).

[2] See also United States v. Vega-Santiago, 519 F.3d 1, 7 (1st Cir. 2008) (en banc) (Torruella, J., dissenting).

to expand government power or shield federal agencies from the consequences of their own failings. Instead, this Court adopts amorphous policy interests alleged by the government through bombastic exaggeration and doomsday predictions in its en banc petition. See Majority Opinion at p. 4 (citing USCIS's argument that the panel opinion would have "dangerous systematic consequences far beyond this case" and would be an "'enormous disincentive for the agency to settle these cases'").

On the issue of whether Aronov was a prevailing party, the majority ignores our sensible precedent that we defer to a district court on the meaning of its own orders. See New England Regional Council of Carpenters v. Kinton, 284 F.3d 9, 39 (1st Cir. 2002) (affirming a denial of attorney's fees against Massport). The majority then proceeds to resolve the issue without itself bothering to decide the jurisdictional effect of the district court's order. In other words, the majority adopts the government's position on imprimatur without deciding whether USCIS was free to act without the district court's explicit approval of the parties' proposed course of action. The majority concludes that even assuming the district court's order constituted a transfer of its exclusive jurisdiction back to USCIS, the district court's decision was not a consideration of the merits. This conclusion replaces the district court's own explanation of its order with an assumption that the district court exercised its

-34-

power to remand without consideration. Such a conclusion is unfair to our district courts and is not even supported by the precedent on which the majority relies. See Rice Servs., Ltd. v. United States, 405 F.3d 1017, 1025 (Fed. Cir. 2005) (stating that, depending on the context and effect of the order, a remand to an administrative agency can constitute prevailing on the merits). Here, where the remand order effectively mandated the relief Aronov sought and changed the jurisdictional landscape such that that relief could be awarded, the majority must strain to avoid seeing judicial imprimatur.[3]

Similarly, in supporting its ruling for the government on this issue, the majority effectively says that district courts do not have authority to sanction parties that fail to comply when the court allows a clear and unambiguous motion seeking to compel some

---

[3] In this regard, I see the Tenth Circuit's recent decision as indistinguishable from the present case on the prevailing party issue. See Al-Maleki v. Holder, No. 07-4260, 2009 WL 692612 (10th Cir. Mar. 18, 2009). The majority simultaneously admits that the decision may be contrary to its view while attempting to distinguish it on the thinnest of grounds. That the remand order in that case was slightly more detailed and that more litigation had transpired before the remand order cannot be sufficient to distinguish Al-Maleki. Id. at *3. These differences in formatting are not relevant to the effect and force of the remand order or to the Tenth Circuit's conclusion that the government's catalyst arguments were unconvincing. Id. Rather the functional posture of both cases is the same: the district court agreed with the parties joint request for remand for the purpose of allowing the plaintiff's application. Thus, the majority adoption of the government's position that Al-Maleki is distinguishable is strained, elevates form over function, and effectively does create a circuit split.

-35-

specific action. This extension of the rule that formal injunctions must not incorporate other documents by reference, see Fed. R Civ. P. 65(d), seems to me to be both questionable and cumbersome. Nonetheless, the majority unhesitatingly adopts it to support the government's position.

Finally, on the issue of substantial justification, the majority again reaches to support the government's position. Though the agency's own regulation spells out a clear rule -- decisions must be made within 120 days of the initial examination -- the majority calls the agency's violation of its own rule reasonable. Specifically, to avoid granting Aronov relief, the majority relies on the government's attenuated insinuations that our national security will be threatened by ruling against it. But Aronov's modest request for attorney's fees does not seek to prevent the government from performing background checks. Rather he seeks only to recover the costs he was forced to incur to obtain adjudication of his petition after an excessive delay attributable to backlog and a failure to follow protocol. Only through acquiescence to the government's policy suggestions can the majority conclude that it would be unreasonable to expect USCIS to conduct the necessary background checks while complying with its own timing regulations.

With due respect, I suggest that our jurisprudence would better reflect the time-honored motto, "Equal justice under law,"[4] if we showed the same doctrinal flexibility and credulity to policy arguments presented by citizens asking us to limit governmental power, or for compensation for harm caused by governmental error, as shown by the majority to the government in this appeal.  For these reasons, and the reasons stated by Judge Lipez, I respectfully dissent.

**-Dissenting Opinion Follows-**

---

[4]     As appears engraved on the building housing the Supreme Court of the United States.

**LIPEZ, Circuit Judge, with whom TORRUELLA, Circuit Judge, joins,** dissenting. I respectfully dissent from the decision of the majority narrowing the class of plaintiffs who can obtain attorney's fees under the Equal Access to Justice Act ("EAJA"). With its strangely dismissive view of a decision of the district court explaining why Aronov is a prevailing party, the majority refuses to accord that status to an immigrant who, facing a substantial delay in the processing of his application for naturalization, exercised his statutory right to sue the U.S. Citizenship and Immigration Service ("USCIS") and obtained an order from the district court remanding the matter to USCIS so that he could be made a citizen. Invoking national security concerns that are not implicated here, the majority characterizes as substantially justified the conduct of USCIS, whose delay in processing the naturalization application was both contrary to statute and to its own regulations. These legal conclusions are unwarranted, unwise, and contrary to the purpose and promise of the EAJA.

## I.

The facts of this case are straightforward. Aronov applied for naturalization with the Vermont Service Center of USCIS on May 22, 2004. On February 14, 2005, USCIS conducted an initial examination of Aronov regarding his application. As the government acknowledges, the agency's interview with Aronov was premature.

-38-

USCIS's own regulation dictates that an initial examination should be undertaken only after an applicant's full background check has been completed. 8 C.F.R. § 335.2(b). After Aronov was interviewed, federal law required USCIS to adjudicate his application within 120 days. See 8 U.S.C. § 1447(b); 8 C.F.R. § 335.3(a). Aronov heard nothing from USCIS for over a year. He made repeated inquiries about the status of his application. On March 23, 2006, 402 days after his examination, Aronov received a letter from the agency requesting six months more to complete additional review. At that time, Aronov's statutory right to sue USCIS in federal district court to compel action on his application had already accrued. See 8 U.S.C. § 1447(b). On August 28, 2006, 560 days afer his initial examination, and 440 days past USCIS's deadline for adjudicating the application, Aronov filed suit.

Thirty-nine days later, the background check was complete. On October 6, 2006, the government and Aronov filed a Joint Motion for Remand Pursuant to 8 U.S.C. § 1447(b). In full, the joint motion read:

> Pursuant to 8 U.S.C. § 1447(b), the parties in this action, plaintiff . . . and defendants Michael Chertoff, Secretary of the United States Department of Homeland Security, et al., hereby jointly move this Honorable Court to remand this matter to the USCIS, so that [it] can grant plaintiff's application for naturalization, and schedule plaintiff's oath ceremony for no later than November 8, 2006. In support of this motion, the parties state as follows:

> 1. On or about August 28, 2006, plaintiff Alexandre Aronov filed this action.
>
> 2. Since that date, USCIS has completed its review of plaintiff's application for naturalization and, if jurisdiction is returned to the agency, would grant the application and schedule plaintiff's oath ceremony for no later than November 8, 2006.
>
> 3. The governing statute, 8 U.S.C. § 1447(b), provides that, in cases in which the agency has failed to render a decision on an application for naturalization within 120 days of the examination of the applicant, the applicant may file suit in district court requesting to adjudicate the application and "[s]uch court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter."
>
> Wherefore, with good cause having been shown, the parties respectfully request that this Court remand this matter to USCIS so that it can grant plaintiff's application for naturalization and schedule plaintiff for an oath ceremony for no later than November 8, 2006.

On October 12, 2006, the court entered an electronic order granting the motion and the remand. The docket text for the remand order states: "Judge Nancy Gertner: Electronic ORDER entered granting 3 Joint Motion to Remand to US Citizenship and Immigration Services."[1]

---

[1] The "3" references the docket number of the joint motion and was hyperlinked to the joint motion's text.

On November 28, 2006, Aronov filed an application for attorney's fees pursuant to the EAJA.[2] The government opposed Aronov's application, asserting that he was not a prevailing party in the litigation under the test established in Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598 (2001), and that the government's position regarding his application was substantially justified. The district court agreed with Aronov and ordered the government to pay him $4,270.94 in attorney's fees and costs. In its order, the district court explained the significance of its October 12 remand order, stating, "the government here was granted not a dismissal, but a remand to the agency conditional on the granting of plaintiff's naturalization by November 8, 2006. Had the naturalization not so occurred, the parties might very well be back in front of this Court litigating a contempt action." Aronov v.

---

[2] The EAJA provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

<u>Chertoff</u>, No. 06-11526, 2007 U.S. Dist. LEXIS 40455, at *5 (D. Mass. Jan. 30, 2007) (emphasis in original). A timely appeal by the government followed. A panel of the court affirmed the award. <u>Aronov</u> v. <u>Chertoff</u>, 536 F.3d 30 (1st Cir. 2008). Subsequently, a majority of the en banc court granted the government's petition for rehearing en banc, vacating the panel opinion.

**II.**

Although parties are ordinarily required, win or lose, to bear their own attorney's fees, <u>see</u>, <u>e.g.</u>, <u>Alyeska Pipeline Serv. Co.</u> v. <u>Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975), a number of exceptions to this default rule have been adopted by statute. One such exception, the EAJA, authorizes an award of attorney's fees and costs to a litigant who has brought a civil suit against the United States if (1) she is the prevailing party in the matter; (2) the government fails to show that its position was substantially justified; and (3) no special circumstances would make such an award unjust. 28 U.S.C. § 2412(d)(1)(A); <u>see also</u> <u>Schock</u> v. <u>United States</u>, 254 F.3d 1, 4 (1st Cir. 2001). By offering qualifying litigants attorney's fees and other expenses, the EAJA seeks "to remove economic deterrents to parties who seek review of unreasonable government action." <u>Schock</u>, 254 F.3d at 4.

The court reviews the district court's decision to grant or deny a fee application under the EAJA for abuse of discretion, <u>id.</u>, "mindful that the district court has an 'intimate knowledge of

-42-

the nuances of the underlying case,'" New Eng. Req'l Council of Carpenters v. Kinton, 284 F.3d 9, 30 (1st Cir. 2002) (quoting Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001)). "Such deference is particularly appropriate where, as here, the correctness of the court's decision depends in large part on the proper characterization of its own statements." Id.

## A. Prevailing Party

The Supreme Court has long held that a plaintiff who obtains a "settlement agreement[] enforced through a consent decree" is a "prevailing party." See Buckhannon, 532 U.S. at 604 (citing Maher v. Gagne, 448 U.S. 122 (1980)). In cases following Buckhannon, most courts have also permitted fees where the plaintiff obtains an order equivalent to a consent decree. See Roberson v. Giuliani, 346 F.3d 75, 81-82 (2d Cir. 2003) (noting the agreement of a majority of appellate courts). For example, the Fourth Circuit held that orders lacking the title "consent decree" support an award if they are "functionally a consent decree," Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 281 (4th Cir. 2002), a formulation we have also employed. See Smith v. Fitchburg Pub. Schs., 401 F.3d 16, 24 (1st Cir. 2005); see also Rice Servs., Ltd. v. United States, 405 F.3d 1017, 1025 (Fed. Cir. 2005) (court action "equivalent" to a consent decree or judgment on the merits); T.D. v. LaGrange Sch. Dist. No. 102, 349 F.3d 469, 478 (7th Cir. 2003) (settlements "sufficiently analogous" to consent decrees).

Given the posture of the underlying litigation, the question in this case is whether the district court's remand order is functionally equivalent to a consent decree. If the order is functionally equivalent to a consent decree, then a fortiori it possesses whatever "judicial imprimatur" a consent decree possesses, see Buckhannon, 532 U.S. 605, and the order makes Aronov a prevailing party. According to the majority, "three related factors" must characterize an order that is the functional equivalent of a consent decree. First, there must be a "court-ordered" change in the legal relationship resulting from the underlying litigation. Second, "there must be judicial approval of the relief vis-a-vis the merits of the case." Third, there must be "judicial oversight and ability to enforce the obligations imposed on the parties." These factors must all be present if a court order is to constitute the functional equivalent of a consent decree. According to the majority, none of the factors was present here.

The majority is wrong. All three factors were present here. The change in legal relationship between USCIS and Aronov was court-ordered. The court satisfied the requirements for approval of a consent decree, which do not require the court to state explicitly that it has approved the relief in relation to the merits of the case. Lastly, the court retained jurisdiction to

enforce the agreement by incorporating the terms of the joint motion into the remand order.

### 1. The change in legal relationship was court-ordered

During the litigation, only the district court possessed the authority to give Aronov the relief he requested. After Aronov filed suit, USCIS lost jurisdiction to adjudicate his application, thereby precluding USCIS from naturalizing Aronov without further court involvement. 8 U.S.C. § 1447(b) ("Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [USCIS] to determine the matter."); see Etape v. Chertoff, 497 F.3d 379, 384-85 (4th Cir. 2007). The parties acknowledged this jurisdictional point in their joint motion for remand to the district court, which highlights the terms of 8 U.S.C. § 1447(b).[3] They understood that

---

[3] Elsewhere parties have litigated the question of whether the court maintains exclusive jurisdiction or, alternatively, concurrent jurisdiction with the USCIS. Most courts have held that the district court has exclusive jurisdiction over the application until it has acted pursuant to the statute. See, e.g., Etape, 497 F.3d at 384-85 (holding that section 1447(b) vests the district court with exclusive jurisdiction over a naturalization application); United States v. Hovsepian, 359 F.3d 1144, 1159 (9th Cir. 2004) (en banc) (same). But see, e.g., Bustamante v. Chertoff, 533 F. Supp. 2d 373, 381 (S.D.N.Y. 2008) (reaching the opposite conclusion). In its initial argument to us, the government did not suggest that USCIS maintained jurisdiction over Aronov's application after he filed suit in district court. In the en banc proceedings, the government alluded to the concurrent jurisdiction argument. Whatever the government's intent with the allusion, it is beside the point. The government's conduct of the litigation reflected its view that it could not act on Aronov's naturalization application without a remand order from the district court. Moreover, as the Tenth Circuit recently pointed out in Al-

-45-

there had to be an intervening judicial order before Aronov could obtain relief. Nothing about this order was automatic; the district court had the discretion to either determine the naturalization issue itself or remand to USCIS with instructions.

This is not the catalyst scenario of Buckhannon. There, the plaintiff alleged that West Virginia law conflicted with federal law, 532 U.S. at 601, and the West Virginia legislature retained its authority throughout the litigation to "unilateral[ly]" amend its laws. See Smyth, 282 F.3d at 278 (using this expression). It exercised that authority and rendered the suit moot, after which the government moved to dismiss the case. Here USCIS could do no such thing. It lacked the authority to "unilaterally" provide Aronov the relief he requested. The district court's order was necessary to return authority to the agency.[4]

---

Maleki v. Holder, No. 07-4260, 2009 WL 692612, at *3 (10th Cir. Mar. 18, 2009), even if USCIS did retain concurrent jurisdiction over the application after the suit was filed, "the district court resolved the litigation before USCIS could voluntarily naturalize [the applicant]." Id. (emphasis in original). This order of events distinguishes Buckhannon regardless of the jurisdictional question.

[4] Contrary to the majority's suggestion, the fact that USCIS acted voluntarily in coming to an agreement with Aronov does not make Aronov ineligible for fees. Voluntary conduct by a defendant is a necessary part of any consent decree process. Indeed, as the Supreme Court has said, "the voluntary nature of a consent decree is its most fundamental characteristic." Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 521-22 (1986). Yet a plaintiff who obtains a consent decree is eligible for fees. Maher, 448 U.S. at 129-30. Similarly, awarding

Moreover, the remand order mandated a change in the legal relationship of the parties -- namely, that Aronov's status change from alien to citizen through an oath ceremony that would take place no later than November 8, 2006. According to the court, it "remanded specifically 'so that USCIS can grant plaintiff's application for naturalization, and schedule plaintiff's oath ceremony for no later than November 8, 2006.'" Aronov, 2007 U.S. Dist. LEXIS 40455, at *4 (quoting Joint Mot. to Remand). There is no mistaking the district court's meaning here. Its remand order incorporated by reference the joint motion of the parties and thereby ordered USCIS to fulfill the promise that it made to Aronov and the court in the joint motion. This was the district court's own understanding of its order. See id. at *4-5.

A district court is in the best position to explain the meaning of its own order. We defer routinely to the district court's view of the significance of its remand order. See Kinton, 284 F.3d at 30 ("Clearly, the district court is in the best position to determine whether its statements . . . should be considered as the functional equivalent of a judicial order within the meaning of Buckhannon."); Harvey v. Johanns, 494 F.3d 237, 242

Aronov fees because the remand order is functionally equivalent to a consent decree would not conflict with our holding in Smith. See Smith, 401 F.3d at 26-27 (noting the defendant's voluntary conduct). The Smith panel expressly set aside as waived the question of whether the order there was functionally equivalent to a consent decree. Id. at 24.

-47-

(1st Cir. 2007) ("We must, of course, accord deference to the district court's interpretation of the wording of its own order."); see also Lefkowitz v. Fair, 816 F.2d 17, 22 (1st Cir. 1987) ("[U]ncertainty as to the meaning and intendment of a district court order can sometimes best be dispelled by deference to the views of the writing judge.").

Here, the majority dismisses the district court's assessment of its October 12 remand order in its subsequent decision on attorney's fees as a "post-hoc explanation for a prior order." If the majority means that the district court's explanation is meaningless because the court could not incorporate by reference the terms of the joint motion into the remand order as a matter of law, then it is incorrect. Whether a court has incorporated an agreement into an order depends on context. In F.A.C., Inc. v. Cooperativa de Seguros de Vida de Puerto Rico, 449 F.3d 185 (1st Cir. 2006), we held that an oral settlement agreement between two parties to a complex RICO dispute was not incorporated into a dismissal order that referred to it. Id. at 190. However, we expressly limited our rejection of the incorporation claim to "the present case," noting, "[h]ard and fast rules may be unwise because of variations in language and context."[5] Id.

_____

    [5] In F.A.C., we discussed the importance of context to the incorporation of a settlement agreement into a dismissal order. F.A.C., 449 F.3d at 190. Here we are dealing with a remand order. If anything, the case for incorporating by reference the terms of a preceding motion into a remand order is stronger than the case

This is a sensible approach. District courts routinely enter orders granting a party's motion without elaboration. The idea that such an order cannot incorporate by reference the terms of the motion to which the order responds is at odds with the daily practice of the courts. To be sure, incorporation by reference may be inappropriate for the entry of a consent decree that addresses a complex lawsuit with many issues and multiple parties. But this is not remotely such a case. The relief Aronov sought was straightforward: "[a]djudicating [his] Application for Naturalization . . . or, in the alternative, [r]equiring [USCIS] to adjudicate [his] application for naturalization." Only two parties were involved. The terms of their joint motion were clear. There was no impediment, legal or practical, to the incorporation of that joint motion into the district court's remand order.

One cannot examine the record below and conclude -- against the district court's interpretation of its own remand order -- that the court did not refer to the joint motion with the intent of incorporating its terms, and with the full expectation that the promises made therein would be fulfilled. The parties' joint

for incorporating by reference the terms of a settlement agreement into a dismissal order. Remand, unlike dismissal, expressly contemplates an ongoing adjudication of a case by a lower court or administrative agency, pursuant to the order of the remanding court. See Blacks Law Dictionary (8th ed. 2004). Remanding courts intend, and the parties expect, the remand order to instruct the lower court or agency about what further proceedings should take place, and orders often accomplish this by incorporation -- e.g., "We remand for proceedings consistent with this opinion."

motion makes specific representations to the court about the action the defendant would take. The court's order refers to the joint motion twice, once by name and once by docket number. USCIS could only understand that the court was ordering it to carry out the promise made to the court. USCIS would naturalize Aronov by November 8, 2006, and thereby change his status from alien to citizen.

**2. The court satisfied the requirements for entering a consent decree**

The majority contends that a district court must "appraise," "weigh" or "evaluate" the merits of a case in relation to the relief provided by the consent decree. The requirements for entering a consent decree were recently summarized by the Supreme Court in Frew ex rel. Frew v. Hawkins:

> Consent decrees entered in federal court must be directed to protecting federal interests. In [Local No. 93], we observed that a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based.

540 U.S. 431, 437 (2004) (citing Local No. 93, 478 U.S. at 525 (collecting cases)); see also Conservation Law Found. of New Eng., Inc. v. Franklin, 989 F.2d 54, 59 (1st Cir. 1993) (listing same requirements). We have also held that district courts must determine that a proposed consent decree is fair, adequate and reasonable before entering it. For example, in Conservation Law

-50-

Foundation, we wrote, "[d]istrict courts must review a consent decree to ensure that it is 'fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute or other authority; [and] that it is consistent with the objectives of Congress . . . .'" 989 F.2d at 58 (quoting Durrett v. Housing Auth. of Providence, 896 F.2d 600, 604 (1st Cir. 1990)); see also United States v. City of Miami, 664 F.2d 435, 441 (Former 5th Cir. 1981).

We agree that it would be difficult for a district court to determine the fairness, reasonableness and adequacy of a proposed agreement without making some evaluation of the merits of the case in relation to the relief provided by the consent decree. However, "how deeply the judge must inquire, what factors he must take into account, and what weight he should give the settling parties' desires will vary with the circumstances." Donovan v. Robbins, 752 F.2d 1170, 1177 (7th Cir. 1984); see also United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1088 (1st Cir. 1994) (holding that the substance of the fairness inquiry will depend on the context). Moreover, neither Frew nor Conservation Law Foundation require that a judge explicitly state, in the court's order or elsewhere on the record, that she has determined that a proposed agreement meets these requirements. See Frew, 540 U.S. at 437; Conservation Law Found., 989 F.2d at 58 (holding that a court must "review" a proposed consent decree). As a reviewing

-51-

court, we assume that a judge understands the role the district court is supposed to play in deciding whether to enter a consent decree, and that the judge acts in accordance with that understanding. As we explained previously regarding this very issue,

> the question is whether the record contains adequate facts to support the decision of the district court to approve the proposed compromise. As to this, as the Supreme Court has observed, "a reviewing court would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based."

United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 280 (1st Cir. 2000) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 437 (1968)).

Here, the record "contain[s] adequate facts to support the decision of the trial court to approve the proposed compromise[]." TMT Trailer Ferry, 390 U.S. at 437. Again, the context is simple. There is one plaintiff, one government agency, and a specific form of relief that is being sought. The judge had the benefit of both the complaint and the parties' joint motion for remand. The complaint identified the factual and legal bases for providing relief. The joint motion isolated the relevant facts and law, and asserted "good cause" for remanding to the agency for naturalization. From these documents, the district court could

-52-

readily evaluate the merits of Aronov's claim in relation to the relief described in the joint motion, and determine that the jointly proposed agreement was "fair, adequate, and reasonable."[6] The court also could determine that it met the requirements imposed by Frew. In short, the record contains adequate facts to support the court's decision to approve the proposed agreement and incorporate it in an order of the court, and there is no reason to assume, as the majority apparently does, that the court failed to make the necessary determination.

### 3. The court retained jurisdiction to enforce the agreement

The majority argues that the district court's order "did not contain provisions for future enforcement typical of consent decrees." But a consent decree need not contain a separate provision explicitly retaining jurisdiction for future enforcement. We have held that if the terms of an agreement are incorporated

---

[6]     There is no legal support for the majority's contention that a defendant must file an answer or "raise defenses" before a consent decree (or its equivalent) may be entered by a federal court. Consent decrees may be entered at any stage of litigation, and are regularly entered before a defendant has filed an answer. See Maimon Schwarzschild, Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform, 1984 Duke L.J. 887, 913 (noting that parties often negotiate consent decrees before the complaint is filed, and that during the period of study nearly one-third of Title VII consent decrees involving the Department of Justice and public employers were entered the day the complaint was filed). Here, in contrast, both parties filed documents with the court. The joint character of the motion for remand provided the court a reasonable basis for evaluating the merits of the case.

into an order, the district court retains jurisdiction to enforce that agreement. Smith, 401 F.3d at 24 ("'Either incorporation of the terms of the agreement or a separate provision retaining jurisdiction over the agreement will suffice [to retain jurisdiction to enforce the agreement].'" (quoting Smyth, 282 F.3d at 283)); see also Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994) (stating this proposition for dismissal orders).[7] Here, the district court incorporated by reference the terms of the joint motion. This incorporation was sufficient to retain jurisdiction for purposes of future enforcement.[8]

---

[7] The majority's statement that "it is also firmly the law that there must be a clear basis within the order . . . for both the court's continuing jurisdiction and its power to enforce an agreement between the parties" demonstrates its refusal to accept Smith, which states that incorporation of a settlement agreement in an order is sufficient for purposes of retaining jurisdiction to enforce that agreement. Smith, 401 F.3d at 24. We have also said that "hard and fast rules may be unwise [on the question of incorporation] because of variations in language and context." F.A.C., 449 F.3d at 190; see supra section II(A)(1). The only authority the majority cites in support of its view, Kokkonen, does not support it. Indeed, the language "clear basis within the order" appears nowhere in Kokkonen. See Kokkonen, 511 U.S. at 379-82. In fact, as several courts have noted, Kokkonen is silent on whether reference suffices to incorporate an agreement for purposes of retaining jurisdiction. See, e.g., Hospitality House, Inc. v. Gilbert, 298 F.3d 424, 431-32 (5th Cir. 2002) ("[T]he Kokkonen Court did not explicitly hold that a district court's order of dismissal must contain an express statement incorporating a settlement agreement in order to vest the court with ancillary jurisdiction . . . ."); Lucille v. City of Chicago, 31 F.3d 546, 549 (7th Cir. 1994) (Cudahy, J., concurring).

[8] To determine whether the remand order was the functional equivalent of a consent decree, I need not decide whether the remand order itself satisfied the procedural requirements necessary for injunctions or to support a motion for contempt. See Fed. R.

-54-

**4. The district court's order was the functional equivalent of a consent decree**

In summary, the change in legal relationship between USCIS and Aronov was mandated by the remand order that incorporated USCIS's representation that it would naturalize Aronov by a certain date. The law does not require that the district court state explicitly that it has evaluated the fairness, reasonableness, and adequacy of a proposed consent decree. It is enough if the record would permit the district court to make that evaluation. The record in this simple case is ample for that purpose. By incorporating the parties' joint motion, the remand order provided

---

Civ. P. 65(d) (discussing form of order); United States v. Saccoccia, 433 F.3d 19, 28 (1st Cir. 2005) (requiring terms to be clear and unambiguous). The crucial question, as the majority acknowledges, is whether the district court retained jurisdiction over the agreement. The remand order did this by incorporating the terms of the joint motion by reference. Given this circumstance, if USCIS had failed to comply with the remand order, Aronov could have asked the court to issue an injunction confirming the naturalization obligation of USCIS and ordering compliance with it. Courts routinely issue supplemental orders to enforce a consent decree as a prelude to the invocation of contempt authority. See, e.g., King v. Greenblatt, 127 F.3d 190, 192 n.5 (1st cir. 1997) (describing the district court's issuance of injunctions "to implement the thrust of the earlier consent decree"). The majority fails to recognize the distinction between consent decrees and injunctions. It suggests wrongly that I have characterized the district court "as having essentially issued an injunction." That is not so. I have concluded that the district court entered the functional equivalent of a consent decree. There are key differences between consent decrees and injunctions -- the viability of incorporation by reference being a principal one. The majority appears to believe that any order that does not meet the heightened standards applicable to injunctions and the contempt sanction "does not order [the parties] to do anything" and leaves the issuing court powerless to enforce the order. Such a conclusion belies the law and common sense.

-55-

a continuing basis for enforcing the agreement if USCIS did not comply with its representations to the court. Thus, the court's remand order was the functional equivalent of a consent decree, and Aronov was a prevailing party.[9]

**B. Substantial Justification**

In addressing the "substantial justification" issue, the majority announces a broad rule to protect USCIS's authority to make policy choices favoring national security interests. As I will explain, no such authority is at issue. The question is much narrower: whether the delay in this case was substantially justified, in light of the fact that USCIS exceeded both the statutory and regulatory deadlines governing the naturalization process.

---

[9] The Tenth Circuit's recent decision in Al-Maleki, 2009 WL 692612, at *2-3, affirmed an award of attorney's fees under EAJA to a naturalization applicant who had filed suit under section 1447(b) after there was a substantial delay in the adjudication of his application. The court's prevailing party analysis is strongly supportive of my analysis here. As I have already noted, supra note 4, the court distinguished Buckhannon on the grounds that the district court had resolved the litigation in favor of the applicant before USCIS naturalized him. Id. at *3. Moreover, the applicant, like Aronov, had submitted a joint motion with USCIS representing to the court that USCIS would naturalize him by a certain date. Id. The Tenth Circuit noted that the court's order was "bas[ed] . . . [on] the parties' stipulations" in the joint motion, and that the order was judicially enforceable against USCIS if the agency failed to comply. Id. Entry of such an order, the Tenth Circuit said, "not USCIS's stipulation, was the action which indelibly alter[ed] the legal landscape between USCIS and [the applicant]." Id. (internal quotation marks and citation omitted). This order sufficed to make the applicant a prevailing party.

The government bears the burden of demonstrating that its position was substantially justified. Schock v. United States, 254 F.3d 1, 5 (1st Cir. 2001). The Supreme Court has interpreted the "substantially justified" language in the EAJA to require reasonableness: "[A]s between the two commonly used connotations of the word 'substantially,' the one most naturally conveyed by the phrase before us here is not 'justified to a high degree,' but rather 'justified in substance or in the main' -- that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988); see also Schock, 254 F.3d at 5; Dantran, Inc. v. U.S. Dep't of Labor, 246 F.3d 36, 40-41 (1st Cir. 2001). Thus, the key question is whether the government's position has "a reasonable basis in law and fact." Pierce, 487 U.S. at 566 n.2.

The majority argues that the government's pre-litigation position insisting on compliance with the name check policy is substantially justified because it "stemmed from two statutory mandates under which it must operate," and because that policy has since been endorsed by Congress. The first statute, 8 U.S.C. § 1446(a), provides that "[b]efore a person may be naturalized, an employee of the [USCIS], or of the United States designated by the Attorney General, shall conduct a personal investigation of the person applying for naturalization." The second mandate cited by the majority, the 1998 Appropriations Act, states: "During fiscal

-57-

year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to [USCIS] shall be used to complete adjudication of an application for naturalization unless [USCIS] has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed . . . ." Depts. of Commerce, Justice & State, The Judiciary & Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, 111 Stat. 2440, 2448-49 (1997) (8 U.S.C. § 1446 note). The majority also suggests that "Congress has since essentially endorsed USCIS's choice to use FBI name checks . . . by appropriating $20 million to USCIS to 'address backlogs . . ..'" See Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, 121 Stat. 1844 (2007).

Relying on Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984), the majority asserts that the court must defer to USCIS's decision to employ the NNCP check because in these statutes Congress has committed decision-making authority to the agency on these issues. The agency has concluded, it says, that the comprehensive FBI name checks are "essential" to the background investigations. Although a small percentage of name checks take a considerable amount of time to complete, isolated delays should not prevent the government from maintaining the name check requirement as its policy.

This argument misconstrues what is at stake in this case. There is no challenge to the authority of USCIS to adopt the name check program as a policy. What is challenged is the application of that policy in this instance. Even if USCIS is entitled to invoke Chevron to defend its use generally of the FBI name check process, see generally Cass Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006) (analyzing the standards for determining whether an agency interpretation is entitled to evaluation under the Chevron framework), deference to the general policy does not imply that the government was substantially justified in its dilatory handling of Aronov's naturalization application.

The government's 440-day delay in acting on Aronov's naturalization application exceeded the deadline imposed by section 1447(b), which gives a district court jurisdiction to entertain a lawsuit by the applicant and evaluate a naturalization application if the agency has failed to adjudicate the application within 120 days after conducting its initial examination. See Etape, 497 F.3d at 385; see also Hovsepian, 359 F.3d at 1163 ("A central purpose of [section 1447(b)] was to reduce the waiting time for naturalization applicants." (citing H.R. Rep. No. 101-187, at 8 (1989); 135 Cong. Rec. H4539-02, H4542 (1989) (statement of Rep. Morrison))). Both the courts and the agency itself have interpreted section 1447(b) as imposing a 120-day deadline for agency action. See, e.g., Al-Maleki, 2009 WL 692612, at *5 (treating statute as imposing a

deadline); <u>Hovsepian</u>, 359 F.3d at 1161; 8 C.F.R. § 335.3(a) ("A decision to grant or deny the application <u>shall be made</u> at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization . . . .") (emphasis added); see also Walji v. Gonzales, 500 F.3d 432, 439 (5th Cir. 2007) ("[B]ecause the clear intent of Congress was to accelerate naturalization applications, and the statutory and regulatory language gives a definite time frame for decision once an examination has occurred, [§ 1447] is violated in situations [where the 120-day deadline is not met].").

The majority's contention that the statute does not command USCIS to act within the deadline is untenable. Although the majority acknowledges that the agency has adopted a regulation, 8 C.F.R. § 335.3(a), that treats the 120-day time frame as a deadline, the majority regards the statutory and regulatory frame as merely aspirational, with no consequences for the agency if it fails to comply.[10] If Congress had taken such a related view of its

_____

[10] The majority also contends that USCIS "could reasonably believe it does not violate the statute by not acting within 120 days on the grounds that the statute does not command it to act within the deadline." The agency's own regulations belie this claim. As noted, part 335.3(a) expressly treats the 120-day time frame as a deadline. Moreover, as a matter of policy, if the naturalization applicant goes to the trouble of filing a lawsuit seeking mandamus on the basis that the 120-day deadline has expired, the agency will capitulate and expedite the FBI name check request. According to a document entitled "FBI Name Check Expedite Criteria," which Aronov attached to his Reply to the government's Response to his Motion for attorney's fees, "In order for USCIS to expedite an FBI Name Check request, one of the following criteria

120-day time frame, it would not have explicitly provided that an applicant whose naturalization application remains unresolved at the end of the 120-day period may file suit in federal court to have the application either adjudicated by the court or remanded to the agency with instructions to adjudicate it.  See, e.g., Etape, 497 F.3d at 384-85 (concluding that after an applicant has filed suit with the district court pursuant to § 1447(b), the court has exclusive jurisdiction over the application).[11]

---

must be established: . . .  Writ of Mandamus -- lawsuit pending in Federal Court."  This policy is an unmistakable acknowledgment that the petitioner invoking his or her statutory right to file suit under section 1447(b) has a sound basis in law and fact for doing so.  It is therefore more accurate to say that the agency's wholesale disregard of the 120-day statutory and regulatory deadline reflects its judgment that most naturalization applicants whose applications are delayed beyond the 120-day statutory deadline will not invoke their statutory right to sue.

[11]    In addition to section 1447(b)'s specific command, the Administrative Procedures Act ("APA") offers a more general directive to agencies to resolve matters presented to them within a reasonable amount of time.  See 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.").  Our assessment of what is reasonable is informed by the relevant statutes and regulations.  See Towns of Wellesley, Concord and Norwood, Mass. v. FERC, 829 F.2d 275, 277 (1st Cir. 1987) (discussing the guidelines, including the existence of a "rule of reason," which govern the time an agency may take to make a decision) (citing Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70 (D.C. Cir. 1984)); Caswell v. Califano, 583 F.2d 9, 16 (1st Cir. 1978) (indicating that courts may look to statutory text to provide a reasonable time limit on agency action).  Here, section 1447(b) and 8 C.F.R. § 335.3(a) provide such guidance.  See Sze v. INS, No. C-97-0569 SC, 1997 WL 446236, at *7 (N.D. Cal. July 24, 1997) ("[T]he 120-day rule provides the court with a measure of what constitutes a reasonable period for INS to process naturalization applications.").

Moreover, the idea that the agency's early examination of Aronov was some sort of one-time "mistake," as the majority suggests, is belied by the briefs, which contain ample discussion of the "flood" of section 1447(b) lawsuits arising from delays in the NNCP process.[12] As they reveal, it was the agency's <u>regular practice</u> to violate its own regulations by examining candidates before receiving NNCP results, and then to compound that error by missing the statutory and regulatory adjudication deadline, thereby giving rise to a substantial number of lawsuits against the agency, at a cost both to taxpayers and applicants. USCIS engaged in precisely that conduct in Aronov's case. Yet, according to the majority, this is a pre-litigation position "justified to a degree that could satisfy a reasonable person." That is an indulgent reasonable person who would view this government conduct so benignly.[13]

Finally, the majority imports national security concerns into its defense of USCIS's handling of Aronov's application. It asserts sweepingly that "the choice by USCIS to favor national

---

[12] <u>See</u> Brief for American Immigration Lawyers Association, as Amicus Curiae in Support of Plaintiff, at 6-7.

[13] I acknowledge the oddity that arises because of the agency's regulations. If USCIS had complied with its regulations and waited to interview Aronov until the FBI name check had been completed, his waiting time for the completion of the naturalization process might have been longer than it was here. This fact does not alter the legal analysis. Once USCIS gave Aronov his initial interview, it had to confront the clear timing obligation imposed by Congress.

security . . . regardless of whether the interview was prematurely granted here, cannot be unreasonable." There is no basis in federal law for holding that an agency is substantially justified in ignoring its own regulations as long as it dutifully cites a national security interest.

Moreover, the majority's invocation of these national security interests reflects its continuing misapprehension of what this case is about. There is no challenge to the general validity of the name-check policy. There is no suggestion that Aronov's naturalization application should have been approved without the security check that the agency deemed necessary.[14] Once Aronov

---

[14] In citing these national security interests, the majority accepts uncritically the relevance of the government's argument that "background checks are critical to insuring public safety and national security." I do not dispute this proposition, which is irrelevant to the disposition of the case. The majority also accepts uncritically the government's assertion that awarding Aronov attorney's fees would "create an enormous incentive for individuals frustrated with delays in the naturalization process to file mandamus lawsuits." It is the agency itself that gives applicants an incentive to file suit by choosing to request expedition of name checks if an applicant files suit. The agency could remove this incentive by requesting expedition before a suit is filed, as the record shows it could. Finally, the majority also endorses the government's suggestion that awarding attorney's fees will create a "disincentive for the agency to settle these cases." Yet the government already pursues such settlements in jurisdictions where it faces the risk of having to pay attorney's fees. See, e.g., Kats v. Frazier, No. Civ. 07-479, 2008 WL 2277598 (D. Minn. May 30, 2008); Ghanim v. Mukasey, 545 F. Supp. 2d 1146 (W.D. Wash. 2008); Phompanya v. Mukasey, No. C07-597MJP, 2008 WL 538981 (W.D. Wash. Feb 25, 2008); Berishev v. Chertoff, 486 F. Supp. 2d 202 (D. Mass. 2007). The agency's decision to seek an early compromise despite facing a risk of paying attorney's fees is easy to understand. By refusing to settle the agency would risk the payment of substantially higher EAJA fees because its

filed a lawsuit, his application was approved promptly. Indeed, the agency adopted a policy of giving priority to naturalization applicants who filed lawsuits pursuant to section 1447(b). If a naturalization applicant went through the time, trouble and expense of filing a lawsuit against the government, the applicant was moved to the head of the line. That policy might make sense to USCIS, but it should not be cost-free in light of the additional expense it imposes on the applicant for naturalization.[15]

Although I do not foreclose the possibility that the government could provide substantial justification grounded in the facts of a particular case for not complying with the 120-day statutory requirement, the government has advanced no such particularized justification here. Instead, the agency has offered

---

unreasonable litigation position would compound the cost of its unreasonable pre-litigation position.

[15] This is the same conclusion reached by the Tenth Circuit in Al-Maleki, 2009 WL 692612, at *6-7. There the court was faced with the same relevant facts: USCIS had failed to meet its 120-day deadline for adjudicating an application; the applicant inquired about the delay, giving the agency notice of it; the source of the delay was the name check; after the applicant filed suit, USCIS asked the FBI to expedite the name check and adjudication was soon thereafter complete. As the court pointed out, these facts undermine the agency's contention that it is unable to process applications in a timely fashion because of the backlog in name check requests. Id. at *7. Rather, USCIS has simply elected to ignore delayed applications until a lawsuit is filed. But USCIS's knowledge that its statutory deadline has passed and its capacity to address the problem by requesting expedition of the name check should motivate the agency to act before a suit is filed. Its decision to expedite requests only if it is sued "is not reasonable in fact." See id.

only general justifications for the delay, including the importance of the agency's policy of requiring name checks for security purposes and the significant backlog of names that the FBI is processing. These explanations, however, do not justify the agency's disregard of the clear statutory mandate. Although I also acknowledge that the agency has valid -- indeed persuasive -- reasons for requiring comprehensive FBI name checks under ordinary circumstances, that policy determination cannot justify the failure to comply with a statutory deadline. See, e.g., Rotinsulu v. Mukasey, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations.").

Despite the agency's plaint to the contrary, USCIS was not caught in a hopeless bind between the national security imperatives of name check review and the 120-day statutory and regulatory deadline. As the facts in this case demonstrate, USCIS could have addressed the name check delay in a manner consistent with the applicable laws and regulations, and without sacrificing national security interests, by doing generally and more promptly exactly what it did here. Instead of waiting for a lawsuit, the agency could have bumped applicants "mistakenly" interviewed before their name checks were completed to the front of the name check line before the 120-day deadline lapsed, saving the applicants and the agency the expense of a lawsuit. At the very least, in those cases where the deadline has already passed and the applicant has

informed the agency of this fact, USCIS could ask the FBI for expedited treatment of the name check.[16] What the agency surely cannot do with "substantial justification" is blatantly ignore the requirements imposed on it by Congress and by itself.

The majority's attempt to invoke an administrative policy to trump an explicit statutory command turns Chevron deference on its head. See Stinson v. United States, 508 U.S. 36, 44 (1993) ("Under Chevron, if a statute is unambiguous the statute governs . . . ." (citations omitted)). In light of the 120-day statutory directive, the regulatory confirmation of that directive, the agency's long delay (nearly four times the statutory period in length), and the absence of any evidence that the government tried to expedite Aronov's application to comply with the statute until he sued, the government's conduct toward Aronov can only be classified as unreasonable and not substantially justified. See Russell v. Nat'l Mediation Bd., 775 F.2d 1284, 1290 (5th Cir. 1985) (concluding that the government's position was not substantially justified because it breached a clear statutory mandate). Accordingly, I would hold that the government was not substantially justified in its pre-litigation position.

## III.

In order to defend the government's position and avoid the simple truth of this case, the majority has burdened its

---

[16] See supra notes 14, 15 and accompanying text.

analysis of the prevailing party issue with undue complexity, and its analysis of the substantial justification issue with unwarranted national security concerns. After waiting through a delay that violated statutory and regulatory deadlines by 440 days, Aronov invoked his explicit statutory right to petition a district court to determine his naturalization application or order USCIS to do so. The lawsuit prompted the agency to complete the name check that had apparently caused the delay within a few weeks of the filing of the lawsuit. With that process completed, the parties asked the court to remand the case to the agency so the naturalization process could be completed. Invoking the EAJA, Aronov then successfully sought a modest award of $4,270.94 in attorney's fees from the district court for the time and trouble he incurred. When the government appealed that award to us, a majority of the panel ruled for Aronov.

But Aronov's time and trouble were far from over. There was the government's petition for en banc review, and now this. The majority's fierce embrace of the government's opposition to this modest award is out of all proportion to the stakes. Its refusal to credit the district court's explanation of its remand order is unprecedented. Its invocation of national security concerns to justify the government's handling of Aronov's application is unjustified. We are left with a holding that is

contrary to the purpose and the promise of the EAJA.  I respectfully dissent.