Yong TANG and Yan Luo, Plaintiffs,

v.

Michael CHERTOFF, Secretary of the Department of Homeland Security; Emilio Gonzalez, Director of U.S. Citizenship and Immigration Services; Paul Novak, Director of USCIS Vermont Service Center; and, Robert Mueller, III, Director of Federal Bureau of Investigation, Defendants.

Civ. Action No. 07cv10231–NG.

United States District Court, D. Massachusetts.

March 1, 2010.

Vard R. Johnson, Boston, MA, for Plaintiffs.

Christopher R. Donato, United States Attorney's Office, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER RE: ATTORNEY'S FEES

GERTNER, District Judge.

This case raises questions concerning the awarding of attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, in a very specific setting—namely, in connection with an adjustment-in-status mandamus petition. It also addresses the scope of the First Circuit's recent decision on the EAJA in *Aronov v. Napolitano,* 562 F.3d 84 (1st Cir.2009), a naturalization mandamus case. Plaintiffs Yong Tang and his wife, Yan Luo, have moved for an award of attorney's fees in the amount of $6,250.00 and court costs in the amount of $250.00. (Application for Allowance of Att'ys' Fees & Costs, document # 21.) The fees stemmed from the complaint they filed on February 6, 2007, seeking to compel the United States Citizenship and Immigration Service ("USCIS") to act on their application for permanent residency. As of the date of the lawsuit, that application had been pending for nearly four years.[1]

The government opposed on jurisdictional grounds. The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a)(2)(B), the government contended, broadly precluded judicial review of any discretionary decision of the Attorney General in immigration matters, or of any matters even related to a discretionary decision. Since

1. Yong Tang was the primary applicant on a Form I–485 Application to Adjust to Permanent Resident Status, and Yan Luo sought a change in her status as a derivative beneficiary of Tang's application. *Tang v. Chertoff,* 493 F.Supp.2d 148, 150 (D.Mass.2007).

adjustment of status was a discretionary decision of the USCIS, the government argued, the Court had no jurisdiction to hear a challenge to an allegedly unconscionable delay in determining Tang's status. While the plaintiffs' initial complaint had been filed pro se, the plaintiffs retained counsel after the government moved to dismiss.

On June 26, 2007, the Court denied the government's motion to dismiss and granted the relief sought by the plaintiffs in a lengthy reported decision, *Tang v. Chertoff*, 493 F.Supp.2d 148 (D.Mass.2007). On the question of jurisdiction, the Court found that the jurisdiction-stripping provisions of the Act applied only to the specific discretionary decisions of the USCIS that were named in the statute. It was not a blanket immunity from all court scrutiny, as the government had argued. In particular, the Court noted:

> I cannot accept the argument that, simply because adjustment of status is a form of discretionary relief, there are no limits to the length of time the USCIS may take processing applications. *The duty to act is no duty at all if the deadline is eternity.*

*Tang*, 493 F.Supp.2d at 150 (emphasis added). Defendants were ordered to adjudicate plaintiffs' application for adjustment of status.[2] On July 19, 2007, the government did so; both plaintiffs became permanent residents of the United States. (Decl. Peter R. Thomas, document # 19.)

On September 5, 2007, plaintiffs' counsel filed a motion for attorney's fees and costs under the EAJA. The EAJA provides:

> [A] court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that

party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The government opposed, and in a round of supplemental briefing ordered by the Court, it argued that the First Circuit's decision in *Aronov* precluded plaintiffs from recovering attorney's fees. The argument had a surface plausibility: The First Circuit in *Aronov* denied attorney's fees in a naturalization case after finding that the delay in processing the citizenship applicant's petition was "substantially justified," even though the delay violated the 120–day limit of 8 U.S.C. § 1447(b). *Aronov*, 562 F.3d at 94–99. The reason for the delay credited by the First Circuit was that national security required the completion of a Federal Bureau of Investigation ("FBI") background check. The government *had* to wait for that check to be completed, and thus the delay in processing the application was substantially justified. *Id.* Since Tang's adjustment of status petition was delayed for the same reason as Aronov's naturalization petition—to complete an FBI background check—it too was substantially justified.

But the government overstates *Aronov* and minimizes the difference between that case and this. Indeed, if the government's interpretation of *Aronov* held sway then "national security" would be the excuse to defeat fees in almost any immigration case challenging agency delay, no matter what

---

**2.** The order stated, "Defendants are ORDERED to adjudicate [plaintiffs'] application for adjustment of status to permanent resident. Defendants shall file an Affidavit dem-

onstrating compliance with this Order on or before August 6, 2007." *Tang*, 493 F.Supp.2d at 158.

the length of time, no matter what the context, and no matter what the particularized showing. The context here is an adjustment of status petition, not a naturalization petition. While the government cannot easily un-naturalize someone who has become an American citizen, it can readily start removal proceedings for a permanent resident if a subsequent background check discloses serious problems.[3] And, in any event, four years—the period of delay in this case—cannot be "substantially justified."

After careful review of the petition, I award attorney's fees and costs in the amount of $4,605.00.

## I. BACKGROUND

Yong Tang filed an I–485 application on June 23, 2003, to adjust his status to that of a permanent resident, with his wife Yan Luo as a derivative beneficiary. *Tang,* 493 F.Supp.2d at 150. He also filed an I–140 Immigrant Petition for Alien Worker through his employer, Millennium Pharmaceuticals, on May 30, 2003. *Id.* The latter was approved by USCIS on March 22, 2004. The plaintiffs were then fingerprinted on August 31, 2004. *Id.*

From August of 2004 until after this litigation commenced in 2007, there was no progress on their applications. Yet plaintiffs persisted: They inquired about the application in 2005 on March 11, July 12, August 10, and September 9 and 13. They inquired in 2006 on May 2 and October 16, and then again on January 30, 2007. Each time they were told the same thing: their background investigations had not been completed, and they should check back in six months. *Id.*

In May of 2006, plaintiffs filed a Freedom of Information and Privacy Act request with the FBI seeking any records relating to them. They were told that there were no such records. *Id.* The conclusion was clear: There were or should have been no impediments to their adjustment in status.

Finally, 43 months after their initial application, they filed this lawsuit—pro se—seeking to compel adjudication of the petition. *Id.* On May 22, 2007, in response to this Court's order concerning the status of the petition, defendants conceded that Yan Luo's background check was completed, but that Yong Tang's was still pending. *Id.*

The government responded to the complaint by moving to dismiss on jurisdictional grounds. (Defs.' Mot. to Dismiss, document # 9.) It noted that 8 U.S.C. § 1252(a)(2)(B) strips the court of jurisdiction to review "any judgment regarding the granting of relief under [8 U.S.C. § 1255]," or "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney Gener-

---

**3.** The First Circuit in fact highlighted this distinction between applications for permanent residency and applications for citizenship in *Aronov:* .

> [T]he importance of the greater certainty that [an FBI] name check provides is highlighted by [USCIS's] choice in 2007 to address the backlog problem [in conducting name checks] by distinguishing between applicants for residency and applicants for citizenship-USCIS grants residency to applicants if their cases were otherwise complete but their name checks remained pending over 180 days from the date of the initial request. The agency reasonably concluded that, if the name checks turned up negative information about applicants, it could initiate removal proceedings against those granted residency while it would have much more difficulty proceeding against those granted citizenship.

562 F.3d at 98 (citation omitted).

al or the Secretary of Homeland Security." *See Tang*, 493 F.Supp.2d at 151. However, the Court concluded that while the ultimate decision—whether or not to adjust an alien's status under 8 U.S.C. § 1255(a)—is "indisputedly within the discretion of the Attorney General," and thus not subject to court review, it does not follow that all actions "that call for some discretion or that have any relation to adjustment of status" are likewise unreviewable. *Tang*, 493 F.Supp.2d at 151. Reading the text of the statute with precision, the Court concluded that the jurisdiction-stripping provision applied "only to those actions or decisions 'the authority for which is *specified under this subchapter* to be in the discretion of the Attorney General or the Secretary of Homeland Security.' " *Id.* at 152. And the decision at issue in this case to allow an adjustment of status matter to drag on for almost four years was surely not included. As the Court stated in its prior opinion:

> I am not persuaded that Congress, despite its careful wording of the jurisdiction-stripping language, intended to vaguely immunize all conduct as long as the agent can be said to have exercised some discretion in the performance of it, or it can be related to a discretionary action. The clear meaning of 8 U.S.C. § 1252(a)(2)(B)(ii) is that courts may not review decisions specified as discretionary by the INA. Despite the care taken in the INA to specify the *substance* of an adjustment of status decision as discretionary, the *pacing* of such a decision is not so specified.

*Tang*, 493 F.Supp.2d at 153–54 (citation omitted).

On June 26, 2007, the Court denied the defendants' motion to dismiss and ordered USCIS to adjudicate Tang's application for adjustment of status, and by extension, that of his wife. In July 2007, the plaintiffs became permanent 'residents of the United States. (Decl. Peter R. Thomas, document # 19.)

Shortly thereafter, the plaintiffs filed a motion for attorney's fees and costs under the EAJA. (Application for Allowance of Att'ys' Fees & Costs, document # 21.)

## II. DISCUSSION

■ The EAJA permits the award of attorney's fees for a litigant who was the "prevailing party" before this Court, unless the Court finds that "the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Once the plaintiff proves that he or she was the "prevailing party," the burden shifts to the government to demonstrate that its "position," before and after the suit was filed, was "substantially justified." *Schock v. United States*, 254 F.3d 1, 5 (1st Cir.2001); *see also* 28 U.S.C. § 2412(d)(2)(B) (defining the phrase "position of the United States" to "mean[ ], in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based"); *Aronov*, 562 F.3d at 86 (noting that the EAJA entitles a "prevailing party" to attorney's fees if the government's position was not substantially justified "either before or after suit was filed," provided that "the award of fees would not otherwise be unjust").

### A. Purpose of the EAJA

The EAJA followed the Supreme Court's rejection of a court-made rule awarding fees to a successful plaintiff under a private attorney general theory. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The Court held that, with limited exceptions, only Congress can authorize a court to award attorney's fees.

*Id.* at 247–71, 95 S.Ct. 1612. And following *Alyeska*, Congress did just that, leading first to the Civil Rights Attorney's Fees Award Act of 1976, Pub. L. No. 94–559, 90 Stat. 2641 (codified as amended at 42 U.S.C. § 1988), and then to the EAJA in 1980.[4]

The EAJA was originally a rider to a small business assistance bill. Gregory C. Sisk, The *Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct* (pt. 1), 55 La. L. Rev. 217, 222 (1994). Its purpose was to aid small businesses and individuals burdened by the legal cost of challenging unjustified government action. *See* EAJA, Pub. L. No. 96–481, § 202, 94 Stat. 2325, 2325 (1980) (setting forth congressional findings and articulating Congress's purpose in enacting the legislation); *Schock*, 254 F.3d at 4. "[A]lthough the statute imposed certain eligibility limits based upon net worth and employment size," Congress expressly "extended the benefits of the EAJA to nearly all citizens or entities contesting unreasonable exercises of government authority." Sisk, *supra*, at 222; *see also* 28 U.S.C. § 2412(d)(2)(B) (defining the term "party" for purposes of subsection 2412(d)). By reimbursing the legal expenses of a small business or individual who prevails over the United States in a civil action, Congress sought to remove the "economic deterrents to contesting governmental action." H.R.Rep. No. 96–1418, at 5–6 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 4984, 4984; *see also Sullivan v. Hudson*,

490 U.S. 877, 890, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989) (recognizing that Congress' purpose in enacting the EAJA was "to diminish the deterrent effect of seeking review of, or defending against, governmental action" (quoting EAJA, § 202(c)(1), 94 Stat. at 2325)).

In immigration cases, the EAJA's purpose of alleviating the burden on individuals forced to incur the costs of litigation to challenge unreasonable government actions has particular resonance. The plaintiffs in such cases are often quite poor, and the stakes are high-the plaintiffs' very ability to stay in this great country is in jeopardy. It would surely be troubling if the EAJA were applied expansively when the agency involved was the Small Business Administration or the Department of Veterans Affairs but not when it was US-CIS.

**B. *Aronov v. Napolitano***

In *Aronov v. Napolitano*, 562 F.3d 84 (1st Cir.2009), the plaintiff was an applicant for citizenship who sued the USCIS because his application had been pending for over a year. He filed suit under 8 U.S.C. § 1447(b), which permits recourse to the federal district court if the USCIS does not act within 120 days of the applicant's citizenship interview examination. *Aronov*, 562 F.3d at 86–87.

Aronov had applied on May 22, 2004, and received his citizenship interview on February 14, 2005. *Id.* at 87. In fact, the scheduling of his citizenship interview itself was a violation of the USCIS regula-

---

4. The EAJA represented a sea change in attorney's fees provisions: "While Congress had previously enacted attorney's fee award statutes to encourage private enforcement of important statutory policies," like the Civil Rights Act of 1964, *see* Pub. L. No. 88–352, § 706(k), 78 Stat. 241, 261 (codified as amended at 42 U.S.C. § 2000e–5(k)), "the EAJA blazed a new path by adopting fee-

shifting as an instrument to monitor government regulation and to deter unjustifiable government policies and enforcement actions." Gregory C. Sisk, The *Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct* (pt. 1), 55 La. L. Rev. 217, 220 (1994).

tions. *Id.* Since the citizenship interview started the section 1447(b) clock, it was not supposed to have been scheduled until an FBI background check had been completed. 8 C.F.R. § 335.2(b).

Immediately after filing the complaint, the parties settled, submitting a Joint Motion for Remand. *Aronov,* 562 F.3d at 87. The motion stated that the "USCIS ha[d] completed its review of plaintiff's application for naturalization and, if jurisdiction [were] returned to the agency, [USCIS] would grant the application and schedule plaintiff's oath ceremony." *Id.* This Court adopted the motion with a short docket endorsement.

Aronov followed up with an application for attorney's fees under the EAJA. *Id.* at 86. The government opposed, arguing that Aronov failed to meet both prongs of the EAJA since he was not a prevailing party under the test established in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), and the government's position regarding his application was "substantially justified." This Court found otherwise on both fronts. *Buckhan-*

*non* required a "material alteration of the legal relationship of the parties" and "judicial imprimatur on the change." *Buckhannon,* 532 U.S. at 604–05, 121 S.Ct. 1835.[5] This Court concluded that Aronov met the test because the Court's remand was contingent on Aronov being naturalized; if the government had not done so, the Court reasoned, Aronov could well have sought a contempt order. *Aronov v. Chertoff,* No. 06–11526–NG, 2007 U.S. Dist. LEXIS 40455, at *5 (D.Mass. January 30, 2007). And the government's position was not substantially justified since the USCIS's delay in processing Aronov's application violated both the statutory and regulatory deadlines governing the naturalization process. *Id.* at *5–*8.

While a panel of the First Circuit affirmed the award, *Aronov v. Chertoff,* 536 F.3d 30 (1st Cir.2008), a majority of the court sitting en banc reversed, *Aronov,* 562 F.3d 84. According to the en banc majority, Aronov was not a prevailing party under *Buckhannon* because this Court did not order USCIS to do anything; it just returned jurisdiction to the agency to allow the parties to carry out their agreement. *Aronov,* 562 F.3d at 88–94. In any event,

---

**5.** In *Buckhannon,* the filing of a lawsuit challenging a West Virginia law which allegedly conflicted with federal law prompted the West Virginia legislature to repeal the provision at issue. 532 U.S. at 600–01, 121 S.Ct. 1835. West Virginia's state fire marshal cited several residential care facilities for violations of a state law that required all residents to be capable of "self-preservation." *Id.* at 600, 121 S.Ct. 1835. The owner of the facility filed suit on behalf of itself, its residents, and other similarly situated entities and individuals, seeking declaratory and injunctive relief from the self-preservation requirement on the grounds that it violated federal law. *Id.* While the suit was pending, the West Virginia legislature repealed the statute at issue, and the state of West Virginia then successfully moved to dismiss the suit as moot. *Id.* at 601, 121 S.Ct. 1835. The plaintiffs sought attor-

ney's fees under the relevant civil rights statutes, contending that they were the "prevailing party" in their lawsuit since their suit served as the "catalyst" for the repeal of the statute. *Id.* In its decision denying the plaintiffs' claim for attorney's fees, the Supreme Court emphatically rejected the "catalyst theory," which had previously been embraced by most courts of appeals. *Id.* at 601–02, 605–10, 121 S.Ct. 1835.

As this Court has previously noted, challenging a state statute presents a somewhat unique situation for the award of fees. After all, nothing would prevent the legislature from changing the law back (apart from its apparent violation of the statutory law). *See Iverson v. Braintree Prop. Assocs., L.P.,* No. 04–cv–12079–NG, 2008 WL 552652, at *5 n. 10, 2008 U.S. Dist. LEXIS 19339, at *17 n. 10 (D.Mass. Feb. 26, 2008).

whether or not Aronov was the prevailing party, the majority held that USCIS's position was "substantially justified," notwithstanding the fact that USCIS's delay was both contrary to the statute and to its own regulations. *Id.* at 94–99. Since the FBI name checks were essential for national security, delaying the petition even beyond the statutory period was "substantially justified."[6] *See id.*

### C. *Aronov* Is Distinguishable

In effect, the government argues that if national security concerns were sufficient in *Aronov* to excuse the USCIS's errors in handling the petition, notwithstanding a specific statute governing the timing of naturalization decisions and the regulations governing the scheduling of immigration interviews, then surely those concerns are sufficient here. There are no mandatory statutory time periods or regulations dealing with delay in adjustment of status petitions.[7]

But this case is different from *Aronov* in several respects: First, unlike in *Aronov*, the government concedes that the plaintiffs were the prevailing parties. And that concession is significant: It puts the burden on the government to show justification. *Schock*, 254 F.3d at 5. Second, the context is different—a delay for background checks in connection with a petition for adjustment of status to permanent resident rather than a naturalization petition. Citizenship conferred without a background check would be difficult to reverse if a subsequent check revealed substantial concerns. Not so with an ad-

---

6. Judge Torruella noted, in dissent:

> It is with monotonous regularity that we dispatch claims of immigration petitioners who have failed to meet one filing deadline or another.... Yet, when a successful plaintiff attempts to get relief provided by the law by seeking $4,270.94 in attorney's fees incurred while forcing the government to adjudicate his much-delayed application, this Court uses exceptional en banc procedures to reverse the award. Even established rules do not seem to influence this Court when it seeks to expand government power or shield federal agencies from the consequences of their own failings. Instead, this Court adopts amorphous policy interests alleged by the government through bombastic exaggeration and doomsday predictions in its en banc petition. *See* Majority Opinion at p. 86 (citing USCIS's argument that the panel opinion would have "dangerous systematic consequences far beyond this case" and would be an " 'enormous disincentive for the agency to settle these cases' ").

562 F.3d at 99 (footnotes omitted).

Referring to the majority's decision that the 120-day requirement was not mandatory, Judge Torruella stated:

> With due respect, I suggest that our jurisprudence would better reflect the time-honored motto, "Equal Justice under the law," if we showed the same doctrinal flexibility and credulity to policy arguments presented by citizens asking us to limit governmental power, or for compensation for harm caused by governmental error, as shown by the majority to the government in this appeal.

562 F.3d at 101 (footnote omitted).

Judge Lipez noted, also in dissent:

> The majority's fierce embrace of the government's opposition to this modest award is out of all proportion to the stakes. Its refusal to credit the district court's explanation of its remand order is unprecedented. Its invocation of national security concerns to justify the government's handling of Aronov's application is unjustified. We are left with a holding that is contrary to the purpose and promise of the EAJA.

562 F.3d at 114.

7. Unlike naturalization in *Aronov*, where the USCIS ignored the 120–day limit to grant or deny citizenship, neither the statute nor the implementing regulations set forth a time frame in which a determination must be made on an application to adjust status. *See* 8 U.S.C. § 1447(b); 8 C.F.R. §§ 245.1–.24. But that does not mean, as I indicated in my previous decision, that "never" is a possibility. *Tang*, 493 F.Supp.2d at 154–56.

justment of status: a background check following an adjustment of status could lead to the withdrawal of that status and the initiation of removal proceedings. *See Aronov*, 562 F.3d at 98. Finally, the time frames are substantially different. The USCIS sat on the Tang petition for nearly four years, almost four times the delay in *Aronov*. If the EAJA is to mean anything in immigration cases, it must apply to the case at bar.

## D. Prevailing Party

Notwithstanding the "prevailing party" concession of the government, it is worth reviewing what the plaintiff accomplished through this litigation: The Court ordered the relief that the petitioner requested, the adjudication of Tang's petition for permanent residency. The legal relationship of the plaintiffs to the defendants prior to the commencement of the litigation was that of applicants for government benefits awaiting a decision for what to them had become an unreasonable period with no end in sight. After this Court's decision on June 26, 2007, that legal relationship was altered. The defendants were ordered to decide plaintiffs' application and to file an affidavit by August 6, 2007, demonstrating that compliance, a ruling supported by a 22–page memorandum. No longer could the defendants dawdle, temporize, or delay. They had approximately a month and a half to grant or deny plaintiffs' applications.

## E. Substantial Justification

The government has the burden of establishing *both* that "the agency action giving rise to the litigation was substantially justified" *and* that "its litigation positions were substantially justified." *Kiareldeen v. Ashcroft*, 273 F.3d 542, 545 (3d Cir. 2001); *see also Schock*, 254 F.3d at 5 (noting that 28 U.S.C. § 2412(d) clearly states that "courts are to examine both prelitigation actions or inaction of the agency on which the litigation is based and the litigation position of the United States").

To be sure, the "substantial justification" standard of the EAJA puts a court in an odd position.[8] It requires that before plaintiffs' counsel can be reimbursed for the fees he incurred getting the government to finally do the right thing, the Court must determine whether the government's wrong position was nevertheless "substantially justified." And "substantially justified" means "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). In effect, it is not enough for the government to have been *wrong* before plaintiffs' counsel can be awarded attorney's fees. The government has to have been *very, very wrong*, or so wrong that a

---

8. This "odd position" is not unlike the position in which the Court finds itself in determining qualified immunity in a civil rights case, *see Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."), or reviewing a state court decision in a habeas corpus case, *see* 28 U.S.C. § 2254(d) (providing that a state prisoner's habeas petition cannot be "granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding").

"reasonable person" would agree that its actions were not justified.

While the substantial justification standard necessarily dilutes the court's review of the agency's action for the purposes of a fee award, that review cannot be conducted in a vacuum. It has to be placed in the context of the EAJA's remedial purposes. To be sure, the en banc majority in *Aronov* cited *Ardestani v. INS*, 502 U.S. 129, 137, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991), for the proposition that the EAJA "must be construed strictly in favor of the government" since it represents a waiver of sovereign immunity. *Aronov*, 562 F.3d at 88. But the en banc majority did not cite the next sentence in *Ardestani*, which makes it clear that once the government action at issue is found to be in the class of proceedings for which the EAJA applies, then the statute has to be construed consistent with congressional intent. *See Ardestani*, 502 U.S. at 137, 112 S.Ct. 515 (noting that *Ardestani* is "distinguishable from those cases in which [the Supreme Court has] recognized that, once Congress has waived sovereign immunity over certain subject matter, the Court should be careful not to 'assume the authority to narrow the waiver that Congress intended'" (quoting *United States v. Kubrick*, 444 U.S. 111, 118, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979))). Delays in connection with administrative actions in an adjustment of status petition are clearly within the subject matter of the EAJA. To impose a "strictly construed" rule runs the risk of altering the statutory framework that Congress has expressly provided—namely, the "substantial justification" standard.

The government argues that its position was "substantially justified" because (1) its four-year delay in adjusting Tang's status was related to unavoidable difficulties in completing his background check and the FBI's primary mission of protecting homeland security; and (2) its motion to dismiss for lack of subject-matter jurisdiction was supported by a wide split among courts about whether they could exercise jurisdiction over any "discretionary" decision assigned to the Attorney General under the Act.

■ I am obliged to agree with the government on the reasonableness of its litigation position. Although I concluded that the government's position was wrong, it was substantially justified given the split among the courts on the question of subject-matter jurisdiction. *Tang*, 493 F.Supp.2d at 150 (referring to the "split" in the courts on this issue). Of course, the government could have avoided the litigation entirely if it had simply done what the government did in *Aronov*—agreed that it had erred. Nevertheless, while that course might have been the better one, I cannot say that the decisions the government made were not "substantially justified."

■ But the delay in addressing the underlying application is quite another matter. *Aronov* cannot mean that since national security concerns may justify the government's FBI background checks before certain immigration decisions are made, they also justify *any delay* in effecting those checks no matter what the length and no matter what the context. Here the government invokes sweeping national security concerns, but it provides no details as to how these concerns explain the delay in this case, especially considering that the fingerprinting of the plaintiffs was completed in 2004 and by 2006 it was clear that the FBI had no records regarding the plaintiffs. The government does not explain why a full FBI name check was necessary, rather than some other security review, and why it took four years. As noted in the Court's previous decision:

It is not necessary in this case to locate the exact position of the boundary between reasonable and unreasonable time for adjudication of permanent residency petitions. Wherever that line may fall, this case is far to the "unreasonable" side. It has taken over four years and counting for the government simply to acknowledge what is already known to them, to plaintiffs, and to the Court: that there are no FBI records pertaining to Tang.

*Tang*, 493 F.Supp.2d at 157–58.

In any event, the fact that this case involved an adjustment-of-status application, not a naturalization petition, weakens the government's argument that the delay in reaching a final decision on the plaintiffs' application was justified by the need to complete an FBI name check. The defendants claim that they "reasonably believed" that they could not adjudicate the application until the FBI completed the name check of Yong Tang based on their reading of 8 C.F.R. § 1003.47(b)(2) and (g), which state:

(b) Covered applications. The requirements of this section apply to the granting of any form of immigration relief in immigration proceedings which permits the alien to reside in the United States, including but not limited to the following forms of relief . . . :

(2) Adjustment of status to that of lawful permanent resident under sections 209 or 245 of the Act, or any other provision of law.

(g) Adjudication after completion of investigations or examinations. In no case shall an immigration judge grant an application for immigration relief that is subject to the conduct of identity, law enforcement, or security investigations or examinations under this section until

after DHS has reported to the immigration judge that the *appropriate investigations or examinations* have been completed and are current as provided in this section and DHS has reported any relevant information from the investigations or examinations to the immigration judge.

8 C.F.R. § 1003.47(b)(2), (g) (emphasis added).

But the question under the regulation is what comprises the "appropriate investigations or examinations" before adjustment of status can be given. In 2008, the US-CIS acknowledged that Immigration and Customs Enforcement ("ICE") required only FBI fingerprint and Interagency Boarder Inspection Services checks, not the more exhaustive FBI name checks, before permitting asylum applicants to be admitted into the United States, and it conceded that no regulation prevented it from following suit for adjustment-of-status applicants. The agency then decided that it would grant adjustment of status petitions before FBI name checks were completed. Its 2008 interoffice memorandum announcing this decision notes:

In the unlikely event that FBI name checks reveal actionable information after the immigration judge grants an alien permanent resident status, [the government] may detain and initiate removal proceedings against the permanent resident. *See* 8 U.S.C. § 1227; *see also* 8 U.S.C. § 1256 (allowing [the Attorney General] to rescind an alien's adjustment of status).

. . . Where the application is otherwise approvable and the FBI name check request has been pending for more than 180 days, the adjudicator shall approve the I–485 . . . and proceed with card issuance.

*See* USCIS Interoffice Memorandum, *Revised National Security Adjudications and Reporting Requirements* (Feb. 4, 2008), *cited in Aronov*, 562 F.3d at 98.[9]

The First Circuit in *Aronov* expressly cited this memorandum and then stated:[10] "[USCIS] reasonably concluded that, if the name checks turned up negative information about applicants, it could initiate removal proceedings against those granted residency while it would have much more difficulty proceeding against those granted citizenship." *Aronov*, 562 F.3d at 98.

Delaying action on an adjustment-of-status petition for an FBI name check, then, was not reasonable at all, nor was the four-year FBI delay in securing those checks.

## F. Amount of the EAJA Award

The Court thus concludes that the plaintiffs are entitled to an award of attorney's fees and court costs because they were the "prevailing party" in this action and the government has not met its burden of proving that its four-year delay in processing the plaintiffs' adjustment-of-status applications was substantially justified or that special circumstances would make an award in this case unjust. *See* 28 U.S.C. § 2412(d)(1)(A), (d)(2)(D). But this conclusion does not fully resolve the parties' dispute. The government opposes not only the plaintiffs' right to recover attorney's fees; it also takes issue with the amount of fees which plaintiffs seek. The government argues that the court should

**9.** At about the same time, the *Washington Post* quoted USCIS spokesman Christopher S. Bentley as stating that "the agency has long wrestled with how to streamline" the effort to adjudicate permanent residency petitions. Spencer S. Hsu, *U.S. to Skirt Green–Card Check*, Wash. Post, Feb. 12, 2008, at A3. He indicated that the 2008 change aligns USCIS practices more closely with those of its sister agency, Immigration and Customs Enforcement, which as noted above permits asylum applicants to be admitted into the United States before FBI name checks are completed. *Id.*

In addition, in a "Questions & Answers" publication explaining the change, USCIS notes:

USCIS has not changed its background check policies as those policies related to naturalization applications. Recently, the agency did modify its existing guidance for applications where the immigration laws allow for the detention and removal of individuals if actionable information from a FBI name check response is received after approval. For these types of applications, *including applications for lawful permanent residence*, the adjudicators will approve the application if it is otherwise approvable and the FBI name check request has been pending for more than 180 days. No application for lawful permanent residence will be approved until a definitive

FBI fingerprint check and Interagency Border Inspection Services (IBIS) check are completed and resolved favorably.

USCIS, *Questions & Answers: FBI Name Check Policy* (2008), http://www.uscis.gov/files/pressrelease/name—check—faq—20feb08.pdf (emphasis added).

**10.** In *Abdi v. Napolitano*, No. 08–cv–11302–JLT (D.Mass. Apr. 28, 2009) (Mem. & Order, document # 29), the court noted:

The Government's argument would likely fail even if it had produced evidence demonstrating that the FBI name check caused the delay. In finding such a delay substantially justified in *Aronov v. Napolitano*, the First Circuit highlighted the significant national security concerns necessitating a full background check of resident aliens seeking naturalization. These concerns do not apply equally, however, to adjustment-of-status applications-a point evidenced by USCIS's decision ... to automatically approve such applications when they have been delayed for 180 days as a result of pending FBI name checks.... Given this distinction, USCIS cannot rely on the argument that national security concerns justify a four-year delay on an adjustment-of-status application.

*Abdi*, No. 08–cv–11302–JLT, slip op. at 3 n. 12.

not award an hourly rate more than that specifically provided for by Congress—$125 per hour.

According to the EAJA, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). While the government argues that there is no shortage of qualified immigration attorneys in Boston to handle the plaintiff's mandamus action, it does not address the cost of living issue.

■ On the issue of the availability of qualified immigration attorneys in Boston, I disagree with the government. The immigration bar is quite small. Lawyers in it have a difficult time keeping pace with the law and getting systematic training. Often there are substantial financial pressures, which make immigration lawyers' practice marginal. *See* Bruce A. Hake, *"Attorney Misconduct"—A Rebuttal*, 4 Geo. Immigr. L.J. 727, 731–33 (1990) (listing the substantial pressures experienced by immigration lawyers, including "the financial strain of representing clients who are often poor"); Leslie C. Levin, *Guardians at the Gate: The Backgrounds, Career Paths, and Professional Development of Private U.S. Immigration Lawyers*, 34 Law & Soc. Inquiry 399, 422–29 (2009) (describing how attorneys in a sample of New York immigration lawyers learned immigration law upon entering the field and stay up to date on changes in the law).[11]

As Judge Tauro noted in *Abdi v. Napolitano*, however, the Supreme Court has interpreted the EAJA's "qualified attorneys" language to mean "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question." No. 08–cv–11302–JLT, slip op. at 4 (D.Mass. Apr. 28, 2009) (quoting *Pierce v. Underwood*, 487 U.S. 552, 572, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). It is difficult to conclude that the mandamus phase of this litigation required anything like a "specialized skill," beyond the usual competence of an immigration attorney.

But the cost of living issue is another matter. Under 28 U.S.C. § 2412(d)(2)(A), the Court may increase the fee-award ceiling of $125 per hour to account for increases in the cost of living. Generally, this Court would calculate the appropriate hourly fee award by "multiplying the $125 statutory rate by the [Boston area] annual average consumer price index figure for all urban consumers ("CPI–U") for the years in which counsel's work was performed, and then dividing by the [Boston area] CPI–U figure for March 1996, the effective date of EAJA's $125 statutory rate." *Shalan v. Chertoff*, No. 05–10980–RWZ, 2006 WL 3307512, at *5 (D.Mass. Nov. 14, 2006) (quoting *Thangaraja v. Gonzales*, 428 F.3d 870, 876–77 (9th Cir.2005), and applying CPI–U figures for the Boston area). In an affidavit submitted in support of plaintiffs' motion for fees and costs, however, the plaintiffs' attorney calculates the proper hourly fee award using the Boston-area CPI–U figure for July 2007, not the Boston-area annual average CPI–U figure for the entire year of 2007 (the year in which plaintiffs' counsel performed his work). *See* Vard R. Johnson Aff. ¶ 7 (document # 21–3). In fact, the attorney's calculation of the proper cost-of-living adjustment could not have relied on the 2007 annual average CPI–U figure since he submitted his affidavit in September 2007, more than

---

11. While these articles do not focus specifically on Boston, nothing in this Court's experience suggests that the Boston immigration bar is immune to the pressures that the articles identify.

three months before the end of the year. Since the difference between the annual average and the July 2007 CPI–U figure is minimal, and since relying on the July 2007 CPI–U figure actually redounds to the government's benefit (since it is slightly less than the annual average), the Court will adopt the cost-of-living calculation set forth in the affidavit of the plaintiffs' attorney. Accordingly, the appropriate fee award in this case is $4,355.00, which represents the total fee for 25 hours of work at the adjusted statutory rate of $174.20 per hour.

## III. CONCLUSION

All of the reasons why Congress enacted the EAJA apply here. The plaintiffs courageously filed an action, pushing the government to do what it surely should have done far more expeditiously in the first case. They started out pro se, not wanting to incur the cost of a lawyer and hoping against hope that merely filing the case would be sufficient to prod the government to do the right thing. It was not. They then retained counsel, who was finally able to prevail. Counsel's fee application could not be more modest. It is entirely consistent with the EAJA, not to mention fair, that counsel be compensated for his efforts.

Accordingly, the Court **AWARDS** attorney's fees in the amount of $4,355.00 and court costs of $250,[12] for a total award of **FOUR THOUSAND, SIX HUNDRED FIVE AND 00/100 DOLLARS ($4,605.00). SO ORDERED.**

---

12. The plaintiffs' attorney submitted an affidavit stating that the plaintiffs paid $250.00 to file their case. *See* Vard R. Johnson Aff. ¶ 9 (document # 21–3). Although this figure conflicts with a February 6, 2007, docket entry in this case noting that a filing fee of $350.00 had been paid, the Court will adopt the figure provided in the affidavit of the plaintiffs' attorney.